Filed 1/15/15  Opinion following order vacating prior opinion.

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

AARON ROBERT CAMPBELL et al.,

     Defendants and Appellants.

E055528

(Super.Ct.No. RIF10003985)

O P I N I O N

APPEAL from the Superior Court of Riverside County.  W. Charles Morgan, Judge.  Affirmed in part and reversed in part.

Steven Schorr, under appointment by the Court of Appeal, for Defendant and Appellant Xavier James Fort.

Laura Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant Aaron Robert Campbell.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III.C, and III.D.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Steve Oetting, Arlene A. Sevidal, and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

Defendant and appellant Aaron Robert Campbell met Silvester Leyva at a hookah bar where they exchanged telephone numbers and discussed buying and selling marijuana.  A few days later, Campbell and defendant and appellant Xavier James Fort, among others, went to Leyva's house to obtain marijuana.  Leyva and his friend, Samuel De La Torre, met Campbell in Leyva's front yard.  After De La Torre handed marijuana to Campbell, Campbell pulled a gun and began to back away toward two waiting vehicles.  Fort, who was standing near the vehicles, fired his gun in the direction of the house.  Leyva was killed by one of the bullets.

A jury convicted defendants of first degree murder and found true a robbery special-circumstance allegation.  The jury also convicted them of two counts of robbery based upon the taking of the marijuana.  In one robbery count, Leyva was the victim; in the other, De La Torre was the victim.

Regarding the murder charge, the jury was instructed on first degree felony murder only, with robbery as the underlying felony.  On appeal, Fort argues that, based on the accusatory pleading, the trial court had a sua sponte duty to instruct on lesser included offenses.  We agree.  Moreover, there was substantial evidence from which a reasonable jury could conclude that a lesser offense, but not the greater, was committed.

2

Therefore, the court erred by failing to instruct the jury as to lesser included offenses. Because the error was not harmless, we reverse Fort's murder conviction. Because the instructional error may have led the jury to convict Fort of the robbery counts, the conviction on those counts are also reversed.

In the nonpublished portion of our opinion we reject defendants' argument that the evidence was insufficient to support their convictions of the robbery of Leyva.

## II. FACTS

A. *Prosecution Evidence*

### 1. De La Torre's Trial Testimony

De La Torre testified to the following. He had known Leyva for about four to six months before the incident. On the evening of the incident, he arrived at Leyva's house between 10:00 p.m. and 10:30 p.m. There were 10 to 15 people present. The garage door was open and there was no power on in the house.

De La Torre brought marijuana and intended "[j]ust to hang out, smoke." De La Torre owned and possessed the marijuana. He did not plan to sell the marijuana. When he and Leyva were in the backyard smoking and drinking, someone informed them that some men were out front looking to buy marijuana, and that they had been texting or calling Leyva. After talking with Leyva, De La Torre took the marijuana out front to sell.

When De La Torre got out front, there were three African-American males asking about marijuana. De La Torre had never seen them before. De La Torre took one bud of marijuana out to show them. During this encounter, both he and Leyva were involved in

3

the conversation. De La Torre did the negotiating while Leyva watched. However, De La Torre said he thought that when the prospective buyer asked for the price, Leyva "maybe threw a number out there . . . ."

At some point, Leyva said the price should be around $550 for two ounces, but De La Torre said he wanted to get $600. De La Torre testified that he did not want to sell it for $550 because Leyva "wanted to make some money or something, so I was helping him out." (The record is not clear as to whether this discussion with Leyva took place before Leyva and De La Torre met the men in the front yard or in the presence of those men.)

The man seeking to buy the marijuana said he did not bring any money and had to go to an ATM. He and the other men left in a red Honda Accord. After they left, the garage door was closed and everyone at Leyva's house went inside. There were no lights on in the house or on the front porch. In the house, Leyva, De La Torre, and others continued smoking marijuana and consuming alcohol.

After about 20 minutes, the red Honda and a silver Chevrolet Malibu or Impala pulled up in front of the house. Looking through the front window, De La Torre observed four or five people get out of the silver car and three get out of the red car. The individuals spread out about an arm's length apart at the sidewalk area. A few of them were on the sidewalk and a few in the street. Around this time, Leyva received a telephone call or text message.

4

After waiting about two minutes, De La Torre walked outside. Leyva and others were behind De La Torre. De La Torre believed the men outside the house intended to take the marijuana against his will. He decided he would give them the marijuana without putting up a fight because he did not want any problems. However, he left the marijuana in an office inside the house.

Leyva asked for the person he had met a few days earlier. An individual with orange hair approached and said he was looking for marijuana and had the money. Leyva was "doing the talking." The conversation occurred on the walkway between the garage and the front door. As Leyva and the ostensible buyer talked, De La Torre went into the house to get the marijuana. When he came back outside, Leyva was still talking with the individual.

When De La Torre held out the bag of marijuana, the man grabbed it and asked if it was all there. De La Torre said it was. The man then stepped back, pulled a gun, cocked it, and told everybody to go back into the house. He said something like: "[D]on't do anything stupid." De La Torre and his friends put their hands up and walked backwards. As he turned to walk into the house, Leyva crossed his path and yelled something like: "I know you guys's homie." He then heard three shots. Leyva was hit. De La Torre did not see anybody firing the shots.

2. <u>Police Interview of Campbell</u>

Leyva's death was investigated by Gary Bowen, a special investigator with the Riverside County Sheriff's Department homicide unit. Bowen found four text messages

5

on Leyva's telephone sent from Campbell's telephone on the day of the shooting at 11:14 p.m., 11:15 p.m., 11:47 p.m., and 11:48 p.m. Bowen interviewed Campbell the day after the shooting. Campbell had orange-tinted hair.

Campbell told Bowen that he met a Hispanic male at a hookah lounge in the City of Riverside. He got the man's telephone number for the purpose of conducting marijuana transactions. Thereafter, and on the evening of the incident, Campbell planned to obtain marijuana from the person he met at the hookah bar by "tak[ing] it from him."

Campbell set up the transaction via text earlier in the evening before the first visit to Leyva's house. When he later returned to the house, the garage door was closed. He sent a text message to Leyva to get him to come outside. Campbell had a gun with him and said he used the gun. He did not know that anyone else had a gun.

Leyva and De La Torre met Campbell outside Leyva's house. When De La Torre produced the marijuana, Campbell took the marijuana with his right hand. He pulled out his gun with his left hand and pointed it at De La Torre and Leyva. He said: "[D]on't do anything stupid." Campbell then got back into his vehicle before any shots were fired.

3. <u>Terence Harris</u>

Harris was in custody as a result of the incident. He testified that two days before the shooting, he and Campbell were at a hookah bar. Campbell and a Hispanic man talked and exchanged telephone numbers.

On the evening of the shooting, Harris was at "J.B.'s" house, hanging out with people who wanted to smoke marijuana. Campbell, Thurston Stewart, Kelton Pounds,

6

and Christian Baker were there, among others. Fort was not there. Campbell said he knew where they could get some marijuana.

Harris, Campbell, Pounds, and Baker discussed a plan to go to Leyva's house, "snatch the marijuana and run." When they arrived at Leyva's house, the garage door was open. Pounds talked with individuals in the garage for about five minutes while the other three stood at the end of the driveway. Pounds was shown marijuana. They did not take the marijuana at that time because there were too many people present.

When they got back to J.B.'s house, the group discussed a plan to return to Leyva's house with more people and steal the marijuana, with "some bit of force" if necessary. Harris knew that Baker and Campbell had guns. They discussed getting another gun. Stewart said his "cousin," Fort, had a gun.

They went to pick up Fort. Harris knew Fort was coming along "to provide a gun." After picking up Fort, they went back to Leyva's house. Harris initially testified that he did not remember if, after Fort got in the car, there was any conversation about what they were going to do at Leyva's house. He later testified that after Fort got in the car there was a discussion about committing the robbery.

They took two cars to Leyva's house. When they arrived, six people got out of the cars. Someone shouted to the people in the house to come outside. They waited for five or 10 minutes before some people came outside. Campbell talked to them. An individual handed Campbell a bag and Campbell passed it to Harris. Campbell then pulled out a gun. As Campbell and Harris were running to the cars, Harris heard somebody from the

7

other group yell something. After getting into a car, he heard two gunshots. He did not see anyone shooting.

Fort got into the car Harris was in. He had a gun in his hand. This was the first time that evening that Harris saw Fort's gun. Fort opened the gun's cylinder and looked at the bullets. Fort said the gun did not shoot, and he seemed surprised that the gun had not gone off. When they got back to J.B.'s house, Fort looked at the gun again and realized it had fired.

Harris did not know what Fort was doing during the incident. The last time he saw Fort before the shooting, Fort was leaning on a fire hydrant across the street from Leyva's house.

4. Police Interview of Fort

Bowen interviewed Fort. During the interview, Fort indicated that on the evening of the shooting he received a call from Stewart about "hang[ing] out." Stewart indicated there would be "loads of grams." Fort understood that there was going to be a "lick" or a robbery and they were "going to rip off some weed."[1] He told Bowen: "They was [*sic*]

---

[1] During the cross-examination of Bowen, relative to Fort's understanding that it would be a "lick," or robbery, the following testimony appears:
  "Q ([DEFENSE COUNSEL]) He said that he just had a feeling. He just knew something was up.
  "A Yes. 'So I had a feeling something was up, so I just took it, and we went over there.' Referring to his gun.
  "Q So he never tells you at that point in time that he knows there's going to be this robbery at Mr. Leyva's house; right?
  "A Well, the next line where I ask him if he's going to do a lick, 'Something, I just knew something was up.'

*[footnote continued on next page]*

8

selling weed, so they—so they probably could have come out with stuff, come out with guns themselves." He took with him a .357-caliber revolver. No one told him to bring his gun; it was his own decision.

After arriving at Leyva's house, Fort stood across the street. At some point, he moved to the front of the residence by the driveway. He saw Campbell pull a gun. Thereafter, Fort fired his weapon two or three times. Fort said that he was scared, that "[e]verything happened so fast," and he "had no idea what was going on."

---

*[footnote continued from previous page]*

"Q He didn't tell you, I knew a robbery was up, he said he 'knew something was up.'
"A He knew a lick was up.
"Q Where does he say that?
"A In the line directly—well, I asked him if he's going to do a lick, and his response was, 'Something, I just knew something was up.'
"Q So when you asked Mr. Fort, 'Were you going to do a lick?' He doesn't say yes, does he? [¶] . . . [¶]
"THE COURT: It's obvious at that point in time he did not say that."

During the redirect examination of Bowen, the following transpired:
"Q ([PROSECUTOR]) So, again, going back to that statement, you asked him if he knew that there—'You already know it's going to be about a lick,' he actually says, 'Uh-huh'—
"A Yes.
"Q —in the affirmative? [¶] And then, 'Yes'?
"THE COURT: No. Just—
"THE WITNESS: Yes.
"([PROSECUTOR]) And then, again, you say, 'Yes'?
"A Yes.
"Q And then he confirms, 'Yeah'?
"A Yes."

9

B. *Defense Evidence*

Fort testified on his own behalf. His cousin, Stewart, called him about 10:00 p.m. on the night of the incident. Stewart wanted to hang out and said something about "loads of grams," which Fort understood to mean a lot of weed. Stewart told Fort he would come by and pick Fort up. He did not tell him to get a gun. Fort thought that "something just didn't seem right" because his cousin does not normally call him like that.

When Fort saw a gray car pull up, he went outside. Stewart told him to get in the red car, which he did. Seeing two cars, he thought they were going to go to a party. On the drive to Leyva's house, nobody mentioned anything about marijuana or a lick. He did not go to the residence to help Campbell commit a robbery.

Fort brought a fully loaded .357-caliber firearm with him. He said he always carries a gun for protection when he leaves the house. He never showed his gun to anyone or told anyone he had it.

After they pulled up to Leyva's house and before getting out of the cars, Campbell texted someone. Fort knew something was wrong because he did not see any cars or people and heard no music. Everyone got out of the cars and spread out. His first thought was to walk away. He initially went across the street, away from the house.

After two or three minutes people came out of the house. A Hispanic man was in the lead and said he wanted to speak to the person who wanted the weed. Campbell walked up to meet the person. Campbell and the other person were arguing. Someone

10

handed the marijuana to Campbell, who then handed it to someone else. He did not hear any threats.

Fort moved into the street by the driveway. There were about six people standing on the walkway. He saw Campbell pull a gun out and put it in "the dude's face." At this point, he thought a robbery was going on. Prior to that time, he did not think the group was going over there to commit a robbery.

People in his group started moving towards the cars by walking backwards. He heard someone scream "gun, gun," and he thought someone was getting a gun and that individuals from the other group were coming after him. He then pulled his gun out and fired it. He explained his action this way: "I see them robbed, I hear 'gun, gun, gun,' I think they're coming out with guns. I see them screaming coming out of the door. It was a reaction."

On cross-examination, Fort said he "knew something was up" that night and he "just knew someone had a gun" because that is "how people roll." He also knew, prior to going to Leyva's house, that Campbell did a lot of licks and that Campbell brought a gun with him. He acknowledged that he had answered affirmatively when Bowen asked about how he knew he was "going to do a lick" and "to rip off some weed." Fort attempted to explain this by testifying that he did not understand what Bowen was asking at that time. Finally, he admitted that he knew that he was shooting at people when he was shooting at the house.

III.  ANALYSIS

A. *Failure to Instruct the Jury on Second Degree Murder and Manslaughter*

The jury was instructed solely on the theory of first degree felony murder with no instructions on lesser included offenses.  Fort contends the jury should have been instructed on the lesser included offenses of second degree murder, voluntary manslaughter based on imperfect self-defense, and involuntary manslaughter.  The Attorney General submits that the court had no duty to instruct on lesser included offenses because second degree murder, voluntary manslaughter, and involuntary manslaughter are not lesser included offenses of first degree felony murder, the sole theory pursued by the prosecution.

We first consider whether second degree murder or manslaughter are lesser included offenses of first degree murder as charged in this case.  We then address whether there is sufficient evidence in the record to support instructions on the lesser offenses.

1.  Lesser Included Offenses to First Degree Murder Under the Accusatory Pleading Test

"'California law has long provided that even absent a request, and over any party's objection, a trial court must instruct a criminal jury on any lesser offense "necessarily included" in the charged offense, if there is substantial evidence that only the lesser crime was committed.  This venerable instructional rule ensures that the jury may consider all supportable crimes necessarily included within the charge itself, thus encouraging the

12

most accurate verdict permitted by the pleadings and the evidence.' [Citation.] '[T]he rule prevents either party, whether *by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other.* Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither "harsher [n]or more lenient than the evidence merits." [Citations.]' [Citation.]" (*People v. Smith* (2013) 57 Cal.4th 232, 239-240 (*Smith*), italics added.)

Courts "have applied two tests in determining whether an uncharged offense is necessarily included within a charged offense: the 'elements' test and the 'accusatory pleading' test. Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former." (*People v. Reed* (2006) 38 Cal.4th 1224, 1227-1228.) In this case, Fort argues that second degree murder, voluntary manslaughter, and involuntary manslaughter are lesser included offenses under the accusatory pleading test.

"'We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.] '" (*People v. Licas* (2007) 41 Cal.4th 362, 366.)

13

Fort was charged in count 1 of the information with "a violation of Penal Code section 187, subdivision (a),[2] a felony, in that on or about August 20, 2010, in the County of Riverside, State of California, he did wilfully, unlawfully, and with deliberation, premeditation, and malice aforethought murder SILVESTER LEYVA, a human being." The pleading thus alleges malice murder committed with deliberation and premeditation. Significantly, the district attorney did not limit the charge to first degree felony murder.

Initially, we note that the failure to specifically allege felony murder did not prevent the prosecution from pursuing that theory at trial. In *People v. Morgan* (2007) 42 Cal.4th 593, the defendant was charged in the accusatory pleading with malice murder. The jury was instructed on, and the defendant was convicted of, felony murder. On appeal, the defendant asserted that the court erred in instructing the jury on felony murder in that it was a "'separate uncharged crime[].'" (*Id.* at p. 616, italics omitted.) The Supreme Court disagreed, stating that "a defendant may be convicted of first degree murder even though the indictment or information charged only murder with malice in violation of section 187." (*Ibid.*; see also *People v. Hughes* (2002) 27 Cal.4th 287, 369 ["an accusatory pleading charging a defendant with murder need not specify the theory of murder upon which the prosecution intends to rely."].) The court added that it continued "to reject, 'as contrary to our case law, the premise underlying defendant's assertion that

---

**2** All further statutory references are to the Penal Code unless otherwise indicated.

14

felony murder and malice murder are two separate offenses.' [Citation.]" (*People v. Morgan, supra,* at p. 616.)

Although the prosecution could and did pursue a felony murder theory in this case, we still look to the accusatory pleading to determine whether Fort was entitled to instructions regarding lesser offenses. (See *People v. Banks* (2014) 59 Cal.4th 1113, 1160.) *People v. Anderson* (2006) 141 Cal.App.4th 430 is on point. There, the defendant was charged with one count of murder under section 187, subdivision (a). After the close of evidence, the prosecution was allowed to orally amend the information by adding the theory of felony murder. The trial court gave no instructions on lesser included offenses.

In reversing the defendant's conviction, the *Anderson* court stated: "We assume for the sake of argument that, as the prosecution argues, the trial court would have had no sua sponte duty to instruct if felony murder were the only crime charged . . . . In this case, however, felony murder was not the crime charged, at least in the accusatory pleading. The . . . information contained only a single charge of murder under Penal Code section 187: . . . . [¶] It has been held consistently that the scope of the sua sponte duty to instruct is determined by the charge contained 'in *the accusatory pleading itself.*' [Citations.] . . . 'When an accusatory pleading alleges a particular offense, it thereby demonstrates the prosecution's intent to prove all the elements of any lesser necessarily included offense. . . .' [Citation.] . . . Because second degree murder and voluntary manslaughter are lesser included offenses of the offense charged against defendant in the amended information, defendant was on notice that she might be convicted of that crime

15

or any of its lesser included offenses—and, by the same token, that she could anticipate instructions on these lesser offenses if they were supported by substantial evidence. [¶] While we realize that, technically, the prosecution amended the information after the close of evidence to include a charge of felony murder, we conclude that this amendment should not be permitted to alter the expectations created by the original information. It is not clear from the transcript that the felony-murder charge supplanted the murder charge contained in the information, since the trial court referred to felony murder as an 'added' charge. If the original charge of murder remained, the sua sponte duty to instruct as to lesser offenses did as well. Even if felony murder had been intended to replace the existing charge, an amendment made at the close of evidence does not satisfy the notice function that underpins the duty of sua sponte instruction. [Citation.] Having established the expectation that instruction on lesser included offenses of murder would be given, if supported by the evidence, the prosecution could not defeat that expectation by amendment after the close of evidence." (*People v. Anderson, supra,* 141 Cal.App.4th at pp. 444-446.)[3]

---

[3] It does not appear from our record that any amendment to the original information was filed. The first indication in our record that the prosecution intended to rely solely on a theory of felony murder for purposes of proving the underlying murder charge was at the close of the prosecution's case, when the prosecutor indicated he was not pursuing a malice theory, but rather relying on the theory of felony murder. The issue was again addressed during the discussion between court and counsel regarding jury instructions. At that time, defense counsel withdrew certain instructions that pertained to an "alternative theory of malice aforethought."

Here, as in *Anderson,* the accusatory pleading alleged malice murder with deliberation and premeditation. Under the accusatory pleading test, the allegation of malice murder with deliberation and premeditation on its face gave rise to possible lesser included offenses of second degree murder, voluntary manslaughter, and involuntary manslaughter. (See *People v. Taylor* (2010) 48 Cal.4th 574, 623 [second degree murder is a lesser included offense of first degree murder]; *People v. Rios* (2000) 23 Cal.4th 450, 460-461 [voluntary manslaughter is a lesser included offense of murder]; *People v. Thomas* (2012) 53 Cal.4th 771, 813 ["Voluntary and involuntary manslaughter are lesser included offenses of murder."].) While the prosecutor was free to try the case on a theory of felony murder, defendants were nonetheless legally entitled under the accusatory pleading test to jury instructions on lesser included offenses of first degree malice murder, provided there is substantial evidence to support the commission of the lesser offenses but not the greater.[4] (*People v. Banks, supra,* 59 Cal.4th at p. 1160.)

*Smith, supra,* 57 Cal.4th 232 is also instructive. There, the defendant was charged with two counts of deterring or resisting an executive officer in violation of section 69.[5]

_____

[4] Because the district attorney did not limit the allegation of first degree murder to the theory of felony murder, we do not address the issue of whether second degree murder and manslaughter are lesser included offenses when only first degree felony murder is alleged. As stated in *People v. Huynh* (2012) 212 Cal.App.4th 285, 314, the "Supreme Court has left open [this] question." (See also *People v. Banks, supra,* 59 Cal.4th at p. 1160 [declining to reach question whether second degree murder is a lesser included offense of felony murder under the statutory elements test].)

[5] Section 69 provides: "Every person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon

*[footnote continued on next page]*

17

Section 69 can be violated in two ways: first, by attempting with threats or violence to deter an officer from performing his or her duties; and second, by resisting an officer by force or violence. On each count, the jury was instructed with the second way: that it had to find that the defendant used force or violence to resist the executive officer. On count 2, the jurors were also instructed that, in the alternative, they could find the defendant guilty of violating section 69 under the first way; that is, by finding that the defendant "'willfully and unlawfully attempted to deter or prevent an executive officer from the performance of any duty imposed upon that officer by law, and the attempt was accomplished by means of a threat of violence.'" (*Smith, supra,* at p. 238.)

In returning its special verdict on count 2, the jury marked a check-box indicating it found the defendant guilty because he violently and forcefully resisted the deputies. The jury did not check the box relative to the defendant willfully and unlawfully attempting to deter an executive officer by means of a threat of violence. (*Smith, supra,* 57 Cal.4th at p. 238.) On appeal, the defendant argued that the trial court had a sua sponte duty to instruct the jury on resisting a public officer under section 148, subdivision (a)(1).[6] He argued that while resisting a public officer may not be a lesser included

---

*[footnote continued from previous page]*
such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, is punishable by [fine or imprisonment, or both]."

[6] A violation of section 148, subdivision (a)(1) is a misdemeanor, punishing those who "willfully resist[], delay[], or obstruct[] any public officer . . . ."

offense of resisting an executive officer by means of a threat or violence, it is a lesser included offense of resisting by means of force.

The Supreme Court agreed with the defendant. It explained that because section 148, subdivision (a)(1) deals with the use of force or violence, and not with attempting by threats or violence to deter, section 148, subdivision (a)(1) was not a lesser included offense based on the elements test. (*Smith, supra,* 57 Cal.4th at pp. 240-241.) However, as the court stated: "[I]n determining whether a trial court has a duty to instruct the jury on lesser offenses, we also consider the language of the accusatory pleading. [Citation.] If the accusatory pleading in the present case had charged only the first way of violating section 69—i.e., that defendant attempted, through threat or violence, to deter or prevent an executive officer from performing a duty—section 148[, subdivision] (a)(1) would not have been a necessarily included offense. But the amended information charged defendant with both ways of violating section 69. In addition to the first way of violating the statute, the accusatory pleading also alleged that defendant violated the statute in the second way by 'knowingly resist[ing], by the use of force or violence, such officer, in the performance of his duty.' . . . [S]ection 148[, subdivision] (a)(1) is necessarily included within this second way of violating section 69." (*Id.* at p. 242.) "[T]he amended information in the present case alleged in both counts that defendant violated section 69 not only in the first way but also in the second way by forcibly resisting an officer. As explained above, it is not possible to violate section 69 in this second way without also violating section 148[, subdivision] (a)(1). Therefore, section 148[, subdivision] (a)(1)

19

was a necessarily included lesser offense of section 69 as alleged in the amended information." (*Id*. at p. 243.)[7]

Like violations of section 69, murder is a crime that can be committed in different ways. A conviction of murder in the first degree can be based on malice with premeditation and deliberation or on first degree felony murder. Even if second degree murder and manslaughter are not lesser included offenses of first degree felony murder, they are lesser included offenses of a premeditated and deliberate murder with malice. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1344-1345; *People v. Breverman* (1998) 19 Cal.4th 142, 153-154 (*Breverman*).) The accusatory pleading in our case alleged a malice murder with deliberation and premeditation. While the accusation permits the prosecution to pursue a theory of first degree felony murder, it nonetheless gives rise to the trial court's sua sponte duty to instruct on lesser crimes of malice murder with premeditation and deliberation when warranted by the evidence.[8]

---

[7] In a concurring opinion, Justice Corrigan observes that application of the accusatory pleading test to an information that alleges nothing more than the statutory language of the offense is wrong. "The [*People v.*] *Barrick* [(1982) 33 Cal.3d 115] court's holding unmoored the accusatory pleading test from the principles on which it was based. In my view, charging a defendant in the statutory language coupled with the use of conjunctive pleading should not yield a different result than applying the statutory elements test." (*Smith*, *supra,* 57 Cal.4th at p. 247 (conc. opn. of Corrigan, J.).)

[8] In response to defendants' argument on appeal, the Attorney General relies on *People v. Huynh, supra,* 212 Cal.App.4th 285. First, we note that the rationale of *Huynh* may to some extent have been undermined by *Smith*. Second, as pointed out by the *Huynh* court, its facts are distinguishable from the facts in *Anderson*. Our case is similar to *Anderson*, and distinguishable from *Huynh*, because the accusatory pleading alleged malice aforethought; the accusatory pleading in *Huynh* did not. Further, the court in *Huynh* relied heavily on the fact that the prosecution had made it clear from the very

*[footnote continued on next page]*

20

2. Substantial Evidence Shows That Lesser Offenses, But Not the Greater Offense of First Degree Felony Murder, Were Committed

Under *Breverman*, instructions on lesser included offenses "are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]" (*Breverman, supra,* 19 Cal.4th at p. 162.) Instructions on lesser included offenses should be given "when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged." (*People v. Wickersham* (1982) 32 Cal.3d 307, 323-324, disapproved on another point in *People v. Barton* (1995) 12 Cal.4th 186, 201.)

Fort was convicted on the basis that he aided and abetted a robbery during which a death causally occurred. For purposes of aiding and abetting liability for felony murder, the jury was properly instructed that the prosecution had to prove: "1. The perpetrator committed the [robbery]; [¶] 2. The defendant knew that the perpetrator intended to commit the [robbery]; [¶] 3. Before or during the commission of the [robbery], the defendant intended to aid and abet the perpetrator in committing the [robbery]; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's

*[footnote continued from previous page]*
beginning of the case that it was relying solely on felony murder. Such is not the case here.

21

commission of the [robbery]." We first consider whether the evidence raises a question as to whether these elements were present.

Here, there is no doubt whatsoever that the perpetrator (Campbell) committed a robbery. Additionally, it is beyond dispute that Fort's conduct did in fact aid and abet Campbell's commission of the robbery. (See *People v. Cooper* (1991) 53 Cal.3d 1158, 1169-1170 ["For purposes of determining liability as an aider and abettor, the commission of robbery continues so long as the loot is being carried away to a place of temporary safety."].) However, if there is substantial evidence that Fort did not know that Campbell intended to commit a robbery or that Fort did not intend to aid and abet the robbery, then the evidence raises a question as to whether the greater offense (first degree felony murder) was committed.

We now examine the relevant evidence as to these two elements. The only evidence that Fort did not know of the impending robbery or did not intend to aid and abet the robbery, came from Fort himself. In his statement to Bowen, Fort indicated that when he received the telephone call from Stewart, Stewart did not say anything "about [a] lick"; he called simply to ask about hanging out. Fort told Bowen that no one told him to bring his gun; it was his decision to do so. Lastly, Fort said that at the time of the robbery, everything happened so fast he did not know what was going on.

At trial, Fort again stated that Stewart called him for purposes of hanging out. He thought they were going to a party, and he took his fully loaded firearm with him because he always takes it for protection when he leaves the house. On the ride over to Leyva's

22

house, nobody said anything about marijuana or a "lick." He testified he did not go to the residence to help commit a robbery. It was not until he saw Campbell pull out his gun that he thought the group was going to commit a robbery. At some point, after Campbell and others started returning to the cars, he heard someone yell "gun, gun," and thought people were coming after him. It was only then that he pulled out his gun and shot it as "a reaction" to seeing people "coming out with guns," and because he feared for his life.

Fort's testimony was contradicted or impeached by other evidence. Fort told Bowen that he took his gun because he had a "feeling something was up." In response to Bowen's question in which he asked Fort if he knew it was going to be a "lick," Fort responded in the affirmative and admitted knowing that they were going to "rip off some weed." Harris testified that on the way over to Leyva's house with Fort in the car, people discussed taking the marijuana. Fort testified that he knew "something was up" because his cousin did not normally call him. He also knew somebody would have a gun that night because he "know[s] how people roll." In particular, he knew that Campbell would have a gun and that Campbell did a lot of licks. When he arrived at Leyva's house he knew something was wrong because he did not see any cars or hear any music. After the marijuana was handed to Campbell, he saw Campbell put a gun in "the dude's face."

While the above evidence strongly suggests that Fort knew Campbell intended to commit a robbery and intended to aid and abet the robbery, that is not our inquiry. "The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.

23

[Citations.] That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser. [Citations.] To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist. [Citations.]" (*People v. Blair* (2005) 36 Cal.4th 686, 744-745.) Here, if Fort's testimony about his knowledge and intent and his corroborating comments to Bowen are believed, a jury could have concluded that Fort did not know that Campbell was going to commit a robbery or that Fort did not intend to aid and abet a robbery and, therefore, that Fort was not guilty of first degree felony murder.

There is also substantial evidence that the lesser offense of second degree murder was committed because Fort admitted shooting at people as a "reaction" to the situation and with "no idea what was going on." (See *People v. Memro* (1985) 38 Cal.3d 658, 700 [second degree murder lies when the defendant engages in an act in conscious disregard for human life involving a high degree of probability that it will result in death], overruled on another point in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2; *People v. Pearson* (2013) 56 Cal.4th 393, 443 [a premeditated and deliberate intentional killing occurs as "'the result of preexisting thought and reflection rather than unconsidered or rash impulse.'"].) There is also substantial evidence from which the jury could have concluded that Fort committed voluntary manslaughter. Voluntary manslaughter may be committed when one kills with the honest but unreasonable belief of the need to defend

24

oneself. (*People v. Blakeley* (2000) 23 Cal.4th 82, 88-89.) Fort's testimony that he thought that people from the opposing group of people were "coming out with guns," if believed by the jury, would support a conviction of voluntary manslaughter.[9]

While on a cold record we are unable to assess Fort's credibility, there is enough evidence, viewed in light of the surrounding circumstances, from which a jury composed of reasonable persons could conclude that Fort was guilty of a lesser offense but not the greater. (See *People v. Wickersham, supra,* 32 Cal.3d at p. 324 [in deciding whether to give lesser included instructions "trial court [is not] to determine the credibility of witnesses."].) Therefore, the failure to instruct the jury as to second degree murder and voluntary manslaughter was error.

B. *The Instructional Error Was Not Harmless*

"[T]he failure to instruct sua sponte on a lesser included offense in a noncapital case is, at most, an error of California law alone, and is thus subject only to state standards of reversibility." (*Breverman, supra,* 19 Cal.4th at p. 165.) Under the state standard, "such misdirection of the jury is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affected the outcome." (*Ibid.,* citing Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d

---

[9] We reject Fort's contention that the shooting of his gun could be viewed as criminally negligent and, therefore, he could be guilty of no more than involuntary manslaughter. (See, e.g., *People v. Carmen* (1951) 36 Cal.2d 768, 776.) Although Fort's testimony, if believed, could support findings he acted without premeditation and deliberation or with an honest but unreasonable belief of the need to defend himself, there is no evidence suggesting that he fired the gun negligently.

818, 836 (*Watson*).) "The Supreme Court has emphasized 'that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*. ([*Watson, supra*, 46 Cal.2d] at p. 837; cf. *Strickland v. Washington* (1984) 466 U.S. 668, 693-694, 697, 698 [80 L. Ed. 2d 674, 104 S. Ct. 2052] ["reasonable probability" does not mean "more likely than not," but merely "probability sufficient to undermine confidence in the outcome"].)' (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 . . . .)" (*People v. Soojian* (2010) 190 Cal.App.4th 491, 519.)

As discussed above, there is substantial evidence that Fort did not intend to aid and abet a robbery and did not know that Campbell intended to commit a robbery. Fort testified no one told him they were going to commit a robbery and he believed they were going to a party. Although he figured out there was no party as they arrived at Leyva's house, it was not until he saw Campbell point a gun at De La Torre that he realized Campbell was there to commit a robbery. He then heard someone yell, "gun, gun" and believed that people were coming after him. According to Fort, he "had no idea what was going on" and fired his gun out of fear for his life. If Fort's testimony is believed, jurors could reasonably conclude he was guilty of second degree murder or voluntary manslaughter based on unreasonable self-defense.

Fort's testimony could, of course, have been rejected by the jury. There was also ample evidence in the record to support inferences that Fort knew they were going to commit a robbery, intended to aid and abet the robbery and was therefore guilty of first

26

degree felony murder. Nevertheless, such evidence is not so strong or overwhelming that we can conclude that the failure to instruct on lesser offenses was harmless. (*Breverman, supra,* 19 Cal.4th at pp. 177-178.) Based on our review of the entire record, it is reasonably probable that the jury, if properly instructed on lesser offenses, would have convicted defendant of a lesser offense of second degree murder or voluntary manslaughter.

The Attorney General asserts that the error in failing to instruct the jury on lesser included offenses is harmless because of the jury's true finding on the robbery-murder special-circumstance allegation and the guilty verdict on the robbery count.[10] The Attorney General relies on the following cases: *People v. Castaneda* (2011) 51 Cal.4th 1292 (*Castaneda*), *People v. Horning* (2004) 34 Cal.4th 871 (*Horning*), *People v. Elliot* (2005) 37 Cal.4th 453 (*Elliot*), *People v. Koontz* (2002) 27 Cal.4th 1041 (*Koontz*), and *People v. Earp* (1999) 20 Cal.4th 826 (*Earp*). These cases hold that a true finding on a felony-murder special circumstance means that the jury would have convicted the defendant of felony murder even if it was instructed on lesser included offenses; therefore, the failure to instruct on the lesser offenses was necessarily harmless. (See,

_____

[10] After we filed an opinion in this case, we vacated the opinion and requested supplemental briefing on the question of whether, under the circumstances presented here, a true finding on the robbery-murder special circumstance and guilty verdict on the robbery count necessarily means that this jury would have convicted Fort of felony murder if it had been given the option of convicting him of lesser offenses. We have received and reviewed the supplemental briefs submitted by the Attorney General and Fort.

27

e.g., *Castaneda, supra,* 51 Cal.4th at p. 1328; *Elliot, supra,* 37 Cal.4th at p. 476.) For the reasons that follow, we do not believe these cases are controlling here.

The rule relied upon by the Attorney General and applied in the cited cases finds its source in *People v. Sedeno* (1974) 10 Cal.3d 703 (*Sedeno*), overruled in *Breverman, supra,* 19 Cal.4th at p. 165.[11] In *Sedeno*, the trial court erred by failing to instruct on involuntary manslaughter as a lesser offense to the charge of murder. (*Sedeno, supra,* at p. 720.) In discussing whether the error was prejudicial, the Supreme Court stated that prejudice cannot be evaluated "by weighing the evidence" and considering the probability that the jury would have convicted the defendant of the lesser offense if it had been given the lesser instruction. (*Ibid.*) However, the court recognized that "in some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury." (*Id.* at p. 721.)

---

[11] In *Breverman,* the court overruled *Sedeno* to the extent that an "erroneous omission of instructions on lesser included offenses . . . *requires* reversal unless 'the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions.' [Citation.]" (*Breverman, supra,* 19 Cal.4th at pp. 164-165, italics added.)

28

In *People v. Flood* (1998) 18 Cal.4th 470, the Supreme Court explained that *Sedeno* should not be read as "delineat[ing] circumstances in which such instructional error *categorically* may be deemed harmless"; rather, the prejudicial effect of such instructional error under California law must ultimately be determined under the *Watson* test. (*People v. Flood, supra,* at p. 490, italics added.) This view was reinforced in *Breverman* when, one month after *Flood*, the court overruled *Sedeno* to the extent that it established a bright line for reversal and held that the failure to give a required lesser included instruction "is not subject to reversal unless an examination of the entire record establishes a reasonable probability that the error affect the outcome." (*Breverman, supra,* 19 Cal.4th at p. 165, citing Cal. Const., art. VI, § 13; *Watson, supra,* 46 Cal.2d at p. 836.)

In light of *Flood* and *Breverman*, it is clear that while a jury's determination on a factual issue under other instructions is relevant to determining whether an instructional error is harmless, it does not *categorically* establish that the error was harmless; the court must still determine whether, based on an examination of the entire record, it is reasonably probable that the error affected the outcome. (*Breverman, supra,* 19 Cal.4th at pp. 174-176.) With this in mind, we consider the cases cited by the Attorney General.

First, we note that in each of the cited cases the jury was instructed on felony murder *and* premeditated and deliberate murder. (*Castaneda, supra,* 51 Cal.4th at p. 1328; *Horning, supra,* 34 Cal.4th at p. 906; *Elliot, supra,* 37 Cal.4th at p. 476; *Koontz, supra,* 27 Cal.4th at p. 1078; *Earp, supra,* 20 Cal.4th at p. 884.) Thus, each jury had an

29

option of finding the defendant guilty of first degree murder (based on premeditation and deliberation) without having to find the special circumstance true. When, in that situation, the jury does make the special circumstance finding, it can be said with confidence that the jury would have convicted the defendant of felony murder even if it had been instructed as to lesser offenses. Such confidence does not exist when, as here, the jury has been instructed on felony murder only.[12]

The distinction is suggested in *Horning, supra,* 34 Cal.4th 871. In that case, the court stated the rule relied on by the Attorney General, then explained its rationale: "Here, the jury was instructed on both premeditated first degree murder and first degree felony murder, as well as on both the burglary-murder and robbery-murder special circumstances. In addition to finding defendant guilty of first degree murder, the jury found both special circumstances true. *If the jury had had any doubt that this was a felony murder, it did not have to acquit but could have simply convicted defendant of first*

---

[12] Although the law ordinarily presumes that jurors follow the court's instructions, the law requiring instructions on lesser included offenses is based, in part, on the possibility that they will not; that is, when faced with an unwarranted all-or-nothing choice between the charged offense and acquittal, jurors may convict a defendant of the charged offense even though they harbor "reasonable doubt of guilt of the charged offense . . . solely because the jury is unwilling to acquit where it is satisfied that the defendant has been guilty of wrongful conduct constituting a necessarily included offense." (*People v. St. Martin* (1970) 1 Cal.3d 524, 533; see also *People v. Eid* (2014) 59 Cal.4th 650, 657 ["A jury instructed on only the charged offense might be tempted to convict the defendant '"of a greater offense than that established by the evidence"' rather than acquit the defendant altogether"]; cf. *Keeble v. United States* (1973) 412 U.S. 205, 212-213 ["Where one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction"].)

*degree murder without special circumstances.* Instead, it found that defendant killed the victim in the perpetration of robbery and burglary, which means it necessarily found the killing was first degree felony murder." (*Id.* at p. 906, italics added.) However, when, as here, the jurors are not given the choice of convicting the defendant of premeditated murder, and are erroneously given only the choice of felony murder or acquittal, the decision to convict the defendant of murder essentially compels them, even if they harbor doubt as to guilt of the underlying felony, to further find the special circumstance allegation true. In this situation, the special circumstance finding may indicate nothing more than that the jury did not want to acquit the defendant of murder, not that they found the killing was first degree felony murder. [13]

Second, the cited cases are easily distinguished from our case based on their facts. In *Castaneda, supra,* 51 Cal.4th 1292, the defendant was convicted of first degree murder, sodomy, kidnapping, and second degree burglary. (*Id.* at p. 1301.) The jury also found true the felony-murder special-circumstance allegations based on sodomy, kidnapping, and burglary The victim's dead body was discovered face down across a medical procedure table. (*Id.* at p. 1303.) She "was naked from the waist down, except where her pants caught on one of her ankles. Her hands were bound behind her back, and

---

[13] As discussed above, the *Sedeno* rule was based upon the jury resolving the question posed by the omitted instruction "in another context." (*Sedeno, supra,* 10 Cal.3d at p. 721.) Because the finding on the special circumstance allegation and robbery conviction in this case are inextricably interwoven with the verdict on the felony murder count, it cannot be said that special circumstance finding and robbery verdict resolved the question posed by the omitted instruction "in another context."

her legs were splayed, with one leg hanging down from each side of the table. Her body was askew, so that her head also hung over one side of the table, and her genital area was near a corner of the table." (*Ibid*.) The defense was that the defendant was elsewhere when the crimes were committed. (*Id.* at p. 1309.) In declining to instruct the jury on second degree murder, the trial court noted that the evidence demonstrated that the victim had been bound and gagged. (*Id.* at p. 1328.)

The Supreme Court, without addressing whether there was substantial evidence to support the lesser crime but not the greater, indicated that any error in failing to give the lesser instruction was harmless because the jury, by finding the special circumstance true, found that the first degree murder conviction was necessarily premised on felony murder. (*Castaneda, supra,* 51 Cal.4th at p. 1328.) Given the facts of *Castaneda*, we do not feel that the court's discussion of the issue is particularly helpful to our analysis. The facts overwhelmingly demonstrated that the perpetrator committed the murder during the commission of numerous felonies. The defense was that defendant was not the perpetrator. Once the jury concluded that the defendant was the perpetrator, the Supreme Court could easily conclude that the special circumstance finding meant that the jury would not have found the defendant guilty of a lesser included offense.

In *Horning, supra,* 34 Cal.4th 871, the victim was a marijuana dealer who kept large amounts of cash in his rural home. The victim had been shot in the head, his body dismembered and his body parts were thrown into the San Joaquin River Delta. (*Id.* at p. 880.) The defendant, who lived nearby, left the area around the time the victim was

32

killed. (*Id.* at pp. 881, 884.) He was arrested six months later in Arizona for committing a bank robbery. (*Id.* at p. 882.) The defense at his murder trial was that he did not kill the victim; the killing was committed by others and was related to the victim's drug dealing. (*Id.* at pp. 885-886.) The defendant was convicted of first degree murder with the special circumstances of robbery murder and burglary murder. Also found true was the allegation that the defendant personally used a firearm. (*Id.* at p. 879.)

On appeal, the defendant argued that the court erred in failing to instruct on second degree murder as a lesser included offense. Significantly, the defendant insisted that instructions on lesser included offenses not be given. (*Horning, supra,* 34 Cal.4th at p. 905.) After discussing the doctrine of invited error, the Supreme Court concluded that any error in failing to instruct as to second degree murder was harmless based on the *Sedeno* rule. (*Horning, supra,* at p. 906.) Moreover, in viewing the questions posed by the jury during deliberation, the court indicated: "[T]he questions suggest that the jury was carefully considering whether defendant had committed the crime, but not that it doubted that the crime was first degree murder." (*Ibid.*) Based on the facts and the defendant's position throughout trial, it is beyond question that the jury, in convicting the defendant of the underlying felonies and the special circumstances, rested its first degree murder conviction on the theory of felony murder. Thus, any error in failing to instruct on second degree murder was clearly harmless.

In *Elliot, supra,* 37 Cal.4th 453, the victim was killed between 2:00 a.m. and 3:00 a.m. as she was closing the Black Stallion bar. (*Id.* at p. 457.) The defendant had been in

33

and out of the bar all evening and interacting with the victim. The victim's body was found in a back room of the establishment with over 82 stab wounds. (*Id.* at p. 460.) Money was found missing from the bar. The victim's keys, including a key to the front door of the bar, were found on the ground outside the bar. (*Id.* at p. 459.) Throughout the course of the investigation, the defendant made various incriminating statements. (*Id.* at p. 462.) The defense presented no evidence. The defendant was convicted of first degree murder and attempted robbery. (*Id.* at p. 457.) The jury also found true the special circumstance allegation that the murder was committed during an attempted robbery. (*Ibid.*) While the jury was told it could convict the defendant of second degree murder, it was not fully informed of the elements of second degree murder. (*Id.* at pp. 474-475.) The verdict form included a space where the jury could return a second degree murder verdict. (*Id.* at p. 474.)

In finding the instructional error harmless, the *Elliot* court concluded that the jury, in finding the attempted robbery special circumstance true, necessarily found that the first degree murder conviction was based on felony murder. (*Elliot, supra,* 37 Cal.4th at p. 475.) Again, as in the cases previously discussed, the jury was presented with an alternative of premeditation and deliberation. Further, the jury was informed that second degree murder was an option. Lastly, evidence supporting felony murder was overwhelming. The keys to the bar were found on the ground outside the bar with the front door unlocked indicating that the victim was attacked as she attempted to lock the

34

front door of the bar; she was taken into a back room of the bar and stabbed more than 82 times.

In *Koontz, supra,* 27 Cal.4th 1041, the defendant, in front of a third party witness, drew a gun on the victim, asked for the victim's car keys, and shot the victim. The defendant then took the witness at gunpoint to the victim's apartment about 25 to 35 yards away. Not finding the keys to the victim's car, the defendant returned with the witness, still at gunpoint, to retrieve the keys from the dying victim. The defendant then drove off in the victim's car. (*Id.* at pp. 1055-1056.) The defense sought to establish that the defendant acted in self-defense, shooting the victim only after the victim assaulted him with a knife, and that it was the witness, not the defendant, who took the keys from the victim. (*Id.* at pp. 1059-1060.) The defendant was convicted of first degree murder, robbery, and kidnapping for purposes of robbery. The jury also found that the murder was committed while the defendant was engaged in the commission of a robbery or attempted robbery. (*Id.* at pp. 1053-1054.)

On appeal, the defendant argued that the court erred in failing to give a lesser included instruction of voluntary manslaughter based on heat of passion or unreasonable self-defense. After concluding there was no evidence to support heat of passion, the court indicated that any error in failing to instruct on voluntary manslaughter based on unreasonable self-defense was harmless because the jury, presented with alternative theories of first degree murder, found true the special circumstance allegation and therefore must have concluded that defendant was guilty of felony murder. (*Koontz,*

35

*supra,* 27 Cal.4th at pp. 1085-1087.)  First, it was obvious the defendant killed the victim, and the jury was presented with alternatives of felony murder and premeditated, deliberate murder.  To convict the defendant of murder, the jury did not have to find that the defendant was guilty of robbery or kidnapping for purposes of robbery.  In that situation, the court could and did confidently conclude that the jury's guilty verdicts on the underlying crimes and the corresponding special circumstance allegations necessarily meant that the jury truly believed the defendant committed the underlying crimes.

Lastly, in *Earp, supra,* 20 Cal.4th 826, the defendant was convicted of first degree murder with three felony-murder special circumstances:  murder in the commission of rape, sodomy, and a lewd or lascivious act upon a child under age 14.  (*Id.* at p. 845.)  The victim was 18 months old.  Evidence of blunt force trauma by a "human penis either inside the rectum or inside the vagina" went unrebutted.  (*Id.* at p. 848.)  The defense theory was that a friend of the defendant engaged in the wrongful sexual conduct.  The defendant asserted that while he was taking care of the victim, a friend he had not seen in two years stopped by to buy some heroin.  After the friend entered the house, the defendant went upstairs to do some work.  When the defendant returned, he saw the friend spanking the child.  Shortly thereafter the friend left and defendant called 911.  (*Id.* at p. 849.)  The trial court instructed the jury on premeditated first degree murder, first degree felony murder and on express malice second degree murder.  It refused to instruct on implied malice second degree murder and involuntary manslaughter.  (*Id.* at pp. 884-885.)

36

On appeal, the defendant argued that the failure to instruct on implied malice second degree murder was error because the prosecution's pathologist testified that the victim's death was caused by a combination of blunt force trauma and the shaking of the victim, and that the defendant only shook the victim to wake her up. (*Earp, supra,* 20 Cal.4th at pp. 885-886.) In dispensing with the argument, the Supreme Court concluded that because the jury found the special circumstances of murder in the commission of rape and murder in the commission of sodomy, it necessarily would not have found implied malice murder or involuntary manslaughter. (*Id.* at pp. 888-889.) Here again, the jury was offered alternative theories of first degree murder and the evidence of the underlying felonies was unequivocal.

It is clear from our examination of the cited cases that the rule relied on by the Attorney General cannot be applied without consideration of the factual context and the other instructions given to the jury. In each case, the jury was offered alternative grounds for finding first degree murder. Significantly, it was patently clear from the facts in each case that an underlying felony had been committed by the perpetrator of the murder. In three of the cases the only defense raised was that it was not the defendant who committed the crimes. In a fourth case, the defendant offered no evidence. In each matter, based on the facts, the defenses presented, the jury instructions given, and the verdicts returned, the court properly concluded that the jury premised its murder verdict on the theory of felony murder and, therefore, would not have returned a verdict on a lesser included offense. (See *People v. Soojian, supra,* 190 Cal.App.4th at p. 519

37

["'reasonable probability' does not mean "more likely than not," but merely "probability sufficient to undermine confidence in the outcome."].)'" Our case is substantially different.

Here, the evidence was clear that there was a homicide and that Fort was the shooter. But, unlike the above cases, Fort's commission of an underlying felony was not patently clear. There was substantial evidence that Fort did not intend to aid and abet a robbery when he fired the shots; the jury could have thus found him guilty of second degree murder or voluntary manslaughter. Nonetheless, because the jury was instructed on felony murder only, the jury was faced with an all-or-nothing proposition: felony murder or acquittal. As instructed, jurors who doubted that Fort aided or abetted a robbery would still understand that convicting Fort of murder meant that they would have to also find him guilty of the underlying felony, robbery. Otherwise, the juror would be left in the seemingly untenable position of voting not guilty as to robbery and allowing an individual who shot and killed another person to walk free. Thus, without the option of convicting Fort of either a lesser offense or of premeditated first degree murder, the jury, if it was to convict Fort at all for the killing of Leyva, was, in essence, compelled to further convict Fort of robbery and find the robbery-murder special circumstance true. Thus, given the facts and instructions presented here, it cannot be said that the jury's true finding on the special circumstance allegation necessarily means that the jury would have found defendant guilty of felony murder if it had been instructed on lesser offenses.

*People v. Ramkeesoon* (1985) 39 Cal.3d 346 is instructive.  There, the defendant was convicted of first degree murder and robbery with findings that he used a deadly weapon.  (*Id.* at p. 348.)  The defendant met the victim at a bar while playing pool.  After some barhopping and eating dinner together, the victim told the defendant the victim was gay.  Later in the evening, the victim invited the defendant to spend the night at his place and stay for the following day, which was Thanksgiving.  The defendant accepted the invitation, but told the victim he should not expect any sexual favors.  The defendant slept on the couch after being asked by the victim to sleep in the victim's room. Throughout Thanksgiving day, the victim made sexual advances toward the defendant. After more barhopping on Thanksgiving evening, the victim and the defendant returned to the victim's residence for the night.  The victim again made advances toward the defendant, indicating that the defendant owed him something.  (*Id.* at pp. 348-349.)  One thing led to another, with defendant eventually stabbing the victim to death.  The defendant testified that after stabbing the victim, he observed the victim's wallet, set of keys, and a wristwatch on the victim's nightstand.  It was at that time that it first occurred to the defendant to steal the objects.  (*Id.* at pp. 349-350.)

At trial, the defendant requested that the jury be instructed on theft as a lesser included offense of robbery.  The request was based on the evidence of the defendant's after-formed intent to steal.  If believed, the defendant would be guilty merely of theft as opposed to robbery, and could not be found guilty of felony murder.  The trial court

refused to instruct on theft as a lesser included offense. (*People v. Ramkeesoon, supra,* 39 Cal.3d at p. 350.)

The Supreme Court, finding that the trial court erred in not instructing on theft, reversed the defendant's murder conviction. As a prelude to its discussion, the court noted: "For purposes of this appeal, we must assume that the first degree murder verdict was based on felony murder since we have no way of knowing whether the jury relied on that theory or on premeditation and deliberation. (See *People v. Green* [1980] 27 Cal.3d [1], pp. 69-71.)" (*People v. Ramkeesoon, supra,* 39 Cal.3d at p. 352, fn. 2.) With this premise in mind, the court indicated: "In the present case, the jury was never presented with the factual question posed by the omitted theft instructions. All it had to work with was a victim who had obviously died as a result of violence perpetrated by another and a defendant who was in possession of the victim's property under extremely suspicious circumstances. Since the jury was deprived of the 'theft option' which was clearly supported by some evidence, it cannot be said that a verdict finding defendant guilty of robbery necessarily resolved the issue posed by the lesser offense instruction adversely to defendant. . . . [¶] The jury here was left with an 'unwarranted all-or-nothing choice' [citation] on both the robbery and murder counts. The omission of the theft instructions practically guaranteed robbery and felony-murder convictions since defendant had admitted taking [the victim's] property and robbery was the only available theft offense. The findings of robbery and murder did not necessarily resolve the factual question of whether the intent to steal was formulated after defendant had inflicted the fatal blows

40

because the jury was never required to decide specifically whether defendant had formed the intent to steal after the assault. . . . Accordingly, the error in failing to instruct on theft and larceny cannot be deemed harmless." (*Id.* at pp. 352-353, fns. omitted.)

While in the present case we are not dealing with the failure to give a lesser included on the underlying felony charge, the analysis is substantially the same. In *Ramkeesoon* and here, there was substantial evidence that the underlying felony was not committed. In *Ramkeesoon*, it was the after-formed intent; here, it is whether Fort had the intent to aid and abet the robbery. In both cases, it is clear that the defendant killed another person. Because the *Ramkeesoon* court assumed for purposes of the appeal that the murder conviction was based on felony murder, the only way the jury in that case and in the present case could convict the defendant of the homicide was to find that the underlying felony had been committed by the defendant. As in *Ramkeesoon*, the jury here was left with an "'unwarranted all-or-nothing choice.'" (*People v. Ramkeesoon, supra,* 39 Cal.3d at p. 352.)

Finally in *People v. Croy* (1985) 41 Cal.3d 1, the court reversed a first degree felony-murder conviction because the jury was misinstructed on the necessary mens rea for aiding and abetting the underlying felony of robbery. (*Id.* at p. 6.) The defendant argued that "the reversal of the robbery conviction necessitates reversal both of the first degree murder conviction, and the special circumstances." (*Id.* at p. 16.) The Supreme Court agreed. "Since robbery was the only possible predicate in this case for felony murder—which may have been the basis for appellant's first degree murder conviction—

41

the latter conviction must also fall, absent any independent finding by the jury appellant harbored malice aforethought." (*Ibid.*)

In sum, Fort's first degree felony murder must be reversed because it is reasonably probable the jury would have convicted him of the lesser offense of second degree murder or voluntary manslaughter based on unreasonable self-defense if given those options. Fort's robbery convictions must also be reversed because they too may have resulted from the "all-or-nothing" choice the instructions gave the jury.

C. *Robbery of Leyva*

Fort and Campbell argue that there is insufficient evidence to support the robbery conviction involving victim Leyva.[14] In particular, they contend there is no substantial evidence that Leyva had possession of the marijuana. We disagree. Although Leyva did not have actual possession of the marijuana, his relationship with De La Torre and his involvement in the transaction was such that he had the authority to protect the marijuana. Therefore, the jury could have reasonably concluded that Leyva had constructive possession of the marijuana.

Robbery is "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211; see *People v. Scott* (2009) 45 Cal.4th 743, 749 (*Scott*).) "'A

---

[14] Although we reverse Fort's robbery convictions because of the instructional error, we still consider his substantial evidence argument because Fort can be retried if the only error is instructional, but cannot if the evidence is insufficient to support the conviction. (See *Burks v. United States* (1978) 437 U.S. 1, 15-16; *People v. Hallock* (1989) 208 Cal.App.3d 595, 607.)

robbery cannot be committed against a person who is not in possession of the property taken or retained. [Citation.] Possession may be actual or constructive. [Citation.] "A person who owns property or who exercises direct physical control over it has possession of it, but neither ownership nor physical possession is required to establish the element of possession for purposes of the robbery statute." [Citation.] "'[T]he theory of constructive possession has been used to expand the concept of possession to include employees and others as robbery victims.'" [Citation.] [¶] . . . [A]ll employees on duty have constructive possession of their employer's property and may be separate victims of a robbery.' [Citation.] In addition, 'persons other than employees may be robbery victims if they have a "'special relationship' with the owner of the property such that the victim had authority or responsibility to protect the stolen property on behalf of the owner." [Citation.] Formulated another way, the question is whether the prospective victim "may be expected to resist the taking." [Citation.]' [Citation.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 687.)

In *Scott*, the Supreme Court held that employees constructively possess their employer's property for purposes of robbery even if the employee's duties do not involve access to or control over the property stolen. (*Scott, supra,* 45 Cal.4th at p. 752.) Although *Scott* was focused on employee victims, the court's rationale was not limited to employment relationships. In construing the robbery statute, the court explained that the Legislature, by "requiring that the victim of a robbery have possession of the property taken, . . . included as victims those persons who, *because of their relationship to the*

43

*property or its owner, have the right to resist the taking*, and has excluded as victims those bystanders who have no greater interest in the property than any other member of the general population." (*Id.* at pp. 757-758, italics added.)

In holding that employees have "some implied authority" to protect the employer's property when it is threatened by a robbery, the court relied on Civil Code section 50. (*Scott, supra,* 45 Cal.4th at p. 754.) This statute, the court explained, "establishes the right to use 'necessary force' to protect the 'property of oneself, or of a wife, husband, child, parent, or other relative, or member of one's family, or of a ward, servant, *master*, or guest.'" (*Ibid.*) While *Scott* emphasized the word "master" in Civil Code section 50 in considering the employee-employer relationship, the same statute and *Scott*'s rationale applies to one who has the right to protect the property of a "guest" when it is threatened by a robbery. (See Civ. Code, § 50.) That is, just as an employee constructively possesses the property of his employer (i.e., his "master") because he has the right to protect the property of the employer, a residential host has the right to protect, and therefore has constructive possession of, the property of his or her "guest."

In discussing the "special relationship" rationale for constructive possession, *Scott* discussed "cases addressing constructive possession by nonemployees," including *People v. Gordon* (1982) 136 Cal.App.3d 519 (*Gordon*) and *People v. Gilbeaux* (2003) 111 Cal.App.4th 515 (*Gilbeaux*). (See *Scott, supra,* 45 Cal.4th at pp. 753-754.) In *Gordon*, Joseph and Mary Lopes lived in their home with their adult son. (*Gordon, supra,* at pp. 523, 529.) The defendant and another man entered the home, displayed a gun, and bound

44

Joseph and Mary. (*Id.* at pp. 523-524.) The men entered the son's bedroom, took a bag containing marijuana, and left. (*Id.* at p. 524.) They took nothing else. (*Ibid.*) The defendant was convicted of two counts of robbery, one against Joseph and one against Mary. Although the parents denied knowledge of their son's marijuana and there was no evidence that either parent physically possessed the items taken, the Court of Appeal held that there was sufficient evidence to support the convictions because the parents had the "responsibility to protect goods belonging to their son who resides with them in their home." (*Id.* at p. 529.)

In discussing *Gordon*, the *Scott* court did not suggest that it should be limited to the parent/adult child situation. Indeed, it pointed to *Gordon* as support for the broader proposition that the victims of robbery must have "some type of 'special relationship' with the owner of the property sufficient to demonstrate that the victim had authority or responsibility to protect the stolen property on behalf of the owner." (*Scott, supra,* 45 Cal.4th at p. 753.)

In *Gilbeaux*, the Court of Appeal affirmed the convictions of robbery against two janitors who worked for an independent contractor of the property owner, a grocery store. (See *Scott, supra,* 45 Cal.4th at p. 754.) The janitorial business assigned two janitors to the grocery store, where they had the responsibility to clean and maintain the store. (*Gilbeaux, supra,* 111 Cal.App.4th at pp. 518, 523.) The defendant and a compatriot bound and gagged the janitors and took the contents of the store's safe. (*Id.* at pp. 518-519.)

45

The *Gilbeaux* court applied the rule that "[c]onstructive possession may be in a servant or agent of a business owner." (*Gilbeaux, supra,* 111 Cal.App.4th at p. 521.) Even though the janitors were not employees of the grocery store and had no responsibility for handling the store's cash, the court concluded that "they had a special relationship with [the store] that made them akin to employees. There are many tax, business, insurance, and liability reasons for a business to use contract workers rather than employees, but none of these reasons reflect on the issue of a worker's possession of the property of a business as against a robber. The janitors were servants or agents of [the store] for the purpose of the robbery." (*Id.* at p. 523.) The *Scott* court explained *Gilbeaux* by stating that "the two janitors had a special relationship with the grocery store and thus had representative capacity with respect to the grocery store sufficient for them to be in constructive possession of the property stolen." (*Scott, supra,* 45 Cal.4th at p. 754.)

*People v. Bekele* (1995) 33 Cal.App.4th 1457, disapproved on another point in *People v. Rodriguez* (1999) 20 Cal.4th 1, 13 and 14, provides another example of the kind of authority to protect property that supports a finding of constructive possession. In that case, the owner of a pickup truck was driving his employer's vehicle, accompanied by a coworker, when he saw the defendant burglarizing his parked truck. (*People v. Bekele, supra,* at pp. 1459-1460.) The driver and the coworker approached the truck from opposite sides as the defendant was putting a tape deck and speakers in a backpack. The defendant got out of the vehicle on the coworker's side and ran away. The coworker

ran after the defendant and yelled at him to stop. Eventually, the defendant stopped and pointed a gun at the coworker. The coworker froze, and the defendant ran off. (*Id.* at p. 1460.) The defendant was later apprehended and convicted of robbery of the coworker, among other crimes. (*Id.* at pp. 1460-1461.)

On appeal, the defendant argued there was insufficient evidence that he robbed the coworker because the property belonged to the owner of the pickup truck, not the coworker. (*People v. Bekele, supra,* 33 Cal.App.4th at p. 1461.) The court stated: "[T]he applicable rule: 'A person must have an ownership interest in the property taken, *or some representative capacity with respect to the owner of the property taken*, or actual possession of the property taken, for the taking of the property to constitute a robbery.' [Citation.]" (*Ibid.*) The court explained that "[the coworker] had a representative capacity with respect to [the driver's] property, in that he had implied authority from [the driver] to take action to prevent its theft." (*Id.* at p. 1462.) This "implied grant of authority" gave the coworker "constructive possession of [the owner's] property." (*Ibid.*)

In the present case, De La Torre was Leyva's guest at all relevant times. For at least some portion of the evening, the bag of marijuana was left in an office inside Leyva's house, unattended by De La Torre. As De La Torre's host, Leyva had the right, under Civil Code section 50, to protect De La Torre's property when it was threatened by a robbery. (Cf. *Scott, supra,* 45 Cal.4th at p. 754.) As noted above, just as that statute supports the existence of a "special relationship" and constructive possession by an employee as to the property of his or her "master" (i.e., employer) for purposes of

47

robbery, the statute and *Scott*'s rationale support the existence of the requisite special relationship and constructive possession by a host as to the property of his or her guest.

Moreover, despite the obvious factual differences between the present case and *Gordon*—e.g., Leyva was not De La Torre's parent and De La Torre did not reside with Leyva—*Gordon* is analogous and supports our conclusion. The rationale of *Gordon*, as *Scott* pointed out, is that the victims (the parents) had constructive possession of the owner's (the son's) marijuana because they had the "responsibility to protect the goods belonging to" the son. Indeed, additional facts in the present case indicate that Leyva's authority to protect the property of De La Torre was greater than that of the parents in *Gordon*. Not only was De La Torre a guest of Leyva, but there is evidence that Leyva acted as a broker or agent for the sale of De La Torre's marijuana: Leyva met with Campbell in a hookah bar and exchanged telephone numbers for the purpose of conducting marijuana transactions; the meeting for the transaction was arranged through text messages from Campbell to Leyva; they met at Leyva's house; Leyva was involved in discussions concerning the price of the marijuana; as indicated by De La Torre's testimony that Leyva "wanted to make some money or something," Leyva appeared to have a financial stake in the transaction; when the ostensible buyers arrived the second time, Leyva demanded to speak with the person he met in the hookah bar and, according to De La Torre, was the person "doing the talking"; finally, Leyva's aggressive action and comment about knowing Campbell's "homies" after Campbell had pointed a gun at him further suggests that Leyva had the authority to protect De La Torre's marijuana.

48

There is thus ample evidence from which to conclude that Leyva was acting in a representative capacity with respect to the handling of De La Torre's marijuana and had the implied authority to protect such property when threatened by robbery. There was, therefore, sufficient evidence to support a finding that he had constructive possession of the property.

The recent decision in *People v. Fiore* (2014) 227 Cal.App.4th 1362 does not change our conclusion.[15] In that case, David Fields was in the business of buying marijuana in Humboldt County and selling it to people in the San Francisco Bay Area. (*Id.* at p. 1367.) Chris Gault introduced Fields to Anthony Young, a Humboldt County marijuana seller. (*Id.* at p. 1368.) The defendant, Brian Fiore, drove Fields to Young's home, where they met Gault and Young. (*Ibid.*) Instead of purchasing marijuana, Fiore and Fields robbed Young of his marijuana at gunpoint and fled. (*Id.* at pp. 1368-1369.) Fiore was convicted of robbing Young and Gault. The Court of Appeal held that the evidence was insufficient to support the conviction of robbery of Gault. (*Id.* at pp. 1385-1387.)

The *Fiore* court, relying principally upon *Scott, supra,* 45 Cal.4th 743, set forth the applicable law regarding constructive possession and the concept of a special relationship between the alleged victim of the robbery and the owner of the property. (*People v. Fiore, supra,* 227 Cal.App.4th at pp. 1385-1386.) The court then explained: "[I]f Gault

---

[15] We requested the parties to file supplemental briefs to address the significance of *Fiore* to the present case. We have received and reviewed the requested briefs on his question.

49

had a special relationship with anyone, it was with Fields, not Young. Gault introduced Fields to Young at Fields's request. The only evidence that Gault was to be paid for participating in the deal was Fiore's testimony that Fields, not Young, promised to pay Gault for each pound of marijuana purchased. And we find nothing in the record to suggest that Gault was involved in negotiating the sale's terms beyond the fact that he was present while Fields and Young were talking. Although the evidence permits an inference that Gault had Young's permission to handle the marijuana for the purpose of letting Fields and Fiore sample it, Young's acquiescence to Gault's momentary control over the property for this limited purpose did not establish that Gault had any right or duty to resist the property's taking or that Young expected him to do so." (*Id.* at p. 1386.)

Here, the robbery took place at Leyva's house, not, as in *Fiore*, at the home of the marijuana owner/seller. As discussed above, the presence of De La Torre's marijuana in Leyva's home provides Leyva with the authority to protect the marijuana from others. Furthermore, Leyva, unlike Gault, was involved in discussions concerning the price of the marijuana; Leyva was not merely present while others talked. Although it appeared that Leyva had financial interest in the transaction, there is no reason to believe that, as in *Fiore*, he was going to be paid by the ostensible purchaser of the marijuana. For these reasons, *Fiore* is distinguishable on its facts.

D. *Stay of Section 12022.53, Subdivision (d) Sentence Enhancement on Count 3*

Fort was convicted of murder (count 1), robbery of Leyva (count 2), and robbery of De La Torre (count 3). As to each, the jury found true allegations that Fort personally

50

and intentionally discharged a firearm and proximately caused death or great bodily injury within the meaning of former section 12022.53, subdivision (d) (hereafter subdivision (d)).  The court sentenced Fort on count 1 to life without the possibility of parole, plus 25 years to life for the subdivision (d) enhancement.  On each of the robbery counts, the court imposed a three-year prison sentence.  The sentence on count 2 was stayed pursuant to section 654.  The court stayed the sentences for the subdivision (d) enhancements on both robbery counts because it believed that "only one use allegation may be used."  The abstract of judgment for Fort reflects the stay of the subdivision (d) enhancements to the robbery convictions.

On appeal, the Attorney General contends the court erred in staying the subdivision (d) enhancement on count 3 because that enhancement is imposed "for each crime."  (See former § 12022.53, subd. (f); *People v. Oates* (2004) 32 Cal.4th 1048, 1057.)  Fort argues that the People have forfeited the claim because of the failure to raise it below.

We do not reach these issues.  Because we reverse the murder conviction on count 1 on a ground that will permit the People to retry Fort, we will remand the matter for further proceedings and resentencing.  The sentencing issue can be raised at the appropriate time.

## IV.  DISPOSITION

As to defendant Aaron Robert Campbell, the judgment is affirmed.

As to defendant Xavier James Fort, the judgment is reversed.

51

CERTIFIED FOR PARTIAL PUBLICATION

KING
                                                                J.


We concur:

HOLLENHORST
            Acting P. J.

McKINSTER
                J.