Filed 8/25/15  P. v. Hardy CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060163 |
| v. | (Super.Ct.No. RIF10004527) |
| ANTWON LEE HARDY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Albert J. Wojcik, Judge. Affirmed in part; reversed in part with directions.

Kristin A. Erickson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found defendant and appellant Antwon Lee Hardy guilty of (1) two counts of assault by means of force likely to produce great bodily injury (Pen. Code, § 245,

1

subd. (a)(4));[1] (2) robbery in an inhabited dwelling house (Pen. Code, §§ 211, 212.5, subd. (a)); (3) two counts of robbery (Pen. Code, § 211); (4) attempted robbery (Pen. Code, §§ 211, 664); (5) attempted carjacking (Pen. Code, §§ 215, subd. (a), 664); (6) carjacking (Pen. Code, § 215, subd. (a)); (7) two counts of false imprisonment (Pen. Code, § 236); (8) elder abuse under conditions unlikely to produce great bodily harm or death (Pen. Code, § 368, subd. (c)); (9) elder abuse under conditions likely to produce great bodily harm or death (Pen. Code, § 368, subd. (b)(1)); (10) two counts of receiving stolen property (Pen. Code, § 496, subd. (a)); (11) carrying a concealed dirk or dagger (Pen. Code, § 21310); and (12) taking a vehicle without the owner's consent (Veh. Code, § 10851, subd. (a)).

As to one of the assault convictions, the jury found true the allegation that defendant inflicted great bodily injury upon Faustino Ruiz. (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8).) In regard to the robbery in an inhabited dwelling house, attempted carjacking, carjacking, and false imprisonment convictions, the jury found true the allegations that defendant personally used a deadly and dangerous weapon during the offenses. (§§ 12022, subd. (b)(1), 1192.7, subd. (c).) The jury also found defendant was sane at the time he committed the offenses. (§ 1026.)

The trial court found true the allegations that defendant suffered (1) two prior convictions that resulted in prison terms (§ 667.5, subd. (b)); (2) a prior serious felony conviction (§ 667, subd. (a)); and (3) five prior strike convictions (§§ 667, subds. (c) &

_____

[1] All further statutory references are to the Penal Code unless indicated.

2

(e)(2), 1170.12, subd. (c)(2)(A)).  The trial court sentenced defendant to prison for a determinate term of 48 years 8 months, and an indeterminate term of 225 years to life.

Defendant raises five issues on appeal.  First, defendant asserts there is a lack of substantial evidence to support five of his convictions and several of the enhancement findings.  Second, defendant asserts the trial court erred by not giving a lesser included offense instruction for one of the robbery counts.  Third, defendant contends the trial court erred by not instructing the jury that defendant could not be convicted of both stealing and receiving the same property.  The People concede defendant's third contention is correct.  Fourth, defendant contends the sentences for two of his convictions should have been stayed pursuant to section 654.  Fifth, defendant contends his state and federal rights of due process were violated when the trial court found defendant competent to stand trial.  We reverse in part and affirm in part.

## FACTUAL AND PROCEDURAL HISTORY

A.     <u>OCTOBER 18, 2010:  HOME INVASION ROBBERY</u>

In October 2010, Faustino Ruiz resided in his home, in Moreno Valley, with Clarence Thomas.  In approximately February and March 2010, defendant resided in Ruiz's home, as a tenant.  Defendant moved out of Ruiz's home when defendant went to jail.  While incarcerated, in April 2010, defendant sent two letters to Ruiz.  In the letters, defendant requested Ruiz hold defendant's social security checks for him.  Ruiz returned the checks to the Social Security Administration.

On October 18, 2010, Ruiz was 74 or 75 years old.  That day, Ruiz was sleeping in bed when defendant punched him.  Defendant repeatedly punched Ruiz, which

3

caused Ruiz to slip into unconsciousness. After being beaten, when Ruiz awoke, he saw defendant walking back and forth carrying things out to a car. Ruiz's hands were bound together by a shoelace and he had been moved into the hallway. Defendant held a medium sized kitchen knife in his hand. Defendant took a backpack, clothing, and "[a]nything he wanted to."

Defendant locked Thomas in a bathroom by placing a stack of kitchen chairs against the bathroom door, and tying the door closed with a necktie. Defendant left in Ruiz's car, a Toyota Corolla, with the license plate number 5VZC744. Defendant had originally tried to take Clarence's car, but Clarence informed defendant that the car had mechanical problems, so defendant took Ruiz's car. A neighbor called the police.

B.    OCTOBER 26, 2010:  PURSE THEFT

During the morning of October 26, 2010, Christine Rincon was at Michael's, a craft store, in Hemet. When Rincon entered the store, she noticed defendant sitting in a car, facing the store. When Rincon exited the store, she "heard an elderly lady yelling, 'He's got my purse, he's got my purse.'" Rincon saw defendant running away from the elderly lady, Bonnie Wharff, holding a purse; Wharff was pointing at defendant. Defendant returned to the car in which he had been sitting. Rincon wrote down the license plate information, except for the final digit, as defendant sped away in the car. Wharff "was really frail-looking and could barely walk."

Hemet Police Officer Abbate was dispatched to the Michael's store. Rincon informed Abbate that the license plate number of the Toyota Corolla was 5VZC74 (missing the last digit).

4

C.    OCTOBER 27, 2010:  VILLAGE RETIREMENT OFFENSES

At approximately 8:00 a.m. on October 27, 2010, Joaquin Cuellar was performing maintenance work at the Village Retirement Community in Hemet.  Cuellar saw a white car, driven by a resident, enter through the gate.  Then Cuellar saw a Toyota Corolla, driven by defendant, follow the white car through the gate.[2]  Cuellar saw defendant follow the resident, walking, through a back door into the apartment building.

Approximately 20 or 30 minutes later, defendant returned to where the cars were parked and tried to open the resident's car.  Cuellar asked defendant, "'What are you doing?'"  Defendant did not respond.  Instead, defendant entered the Toyota Corolla and drove away.  After defendant left, a female employee of the retirement community exited the building yelling to Cuellar, "'[H]elp me, a resident fell off the stairs.'"  Cuellar found the resident "full of blood and he [had been] beaten up."

Officer Abbate was dispatched to the retirement community.  Abbate saw a resident, Edward Hebda, was on the building's stairs.  Hebda's face had been punched multiple times, "his face was completely swollen and black and blue," and he was "extremely shaken up."

---

[2] Cuellar testified that he was unsure whether defendant was the person he saw on October 27, 2010, because it had been three years and the perpetrator did not have a beard.  At trial, Cuellar identified the perpetrator through a photograph, exhibit No. 39.  In 2010, Cuellar identified defendant to law enforcement, via a six-pack photographic line-up.

D.    OCTOBER 27, 2010:  ROSS STORE OFFENSES

At approximately noon on October 27, 2010, Tabatha White was working as the supervising loss prevention officer at a Ross store, in Hemet.  Defendant entered the store and went to the shoe section.[3]  Defendant picked-up a pair of shoes and walked to the front of the store, where White was located.  Defendant said to White, "'I'm taking these fucking shoes and there's not a damn thing you could do about it.'"  White responded, "'Have a good night.'"  White contacted the police.

Abbate was dispatched to the Ross store.  White told Abbate that defendant left the store and entered a Toyota Corolla.  White wrote down the license plate of the Toyota Corolla, which was 5VZC749; however, White said the last digit may have been a four, rather than a nine.

E.    ARREST

Abbate researched the license plate 5VZC744, and found it belonged to a car stolen from Moreno Valley.  Abbate searched the area surrounding the Ross.  At approximately 5:37 p.m., Abbate saw the Toyota Corolla and performed a traffic stop.  Abbate ordered defendant out of the car and took him into custody.  While patting down defendant, Abbate found an eight-inch knife attached to defendant's belt.  Inside the Toyota Corolla, Abbate found the shoes taken from Ross and the identification and credit cards belonging to Wharff.  Abbate also found keys that may have belonged to Hebda.  Abbate confirmed the Toyota Corolla belonged to Ruiz.

---

[3] White was unable to identify defendant as he sat in court during trial. However, White identified the person photographed in exhibit No. 39 as the thief.

6

## DISCUSSION

### A. SUBSTANTIAL EVIDENCE

#### 1. *CONTENTION*

Defendant contends there is a lack of substantial evidence for: (1) the attempted carjacking conviction (§§ 215, 664), in which Thomas was the named victim; (2) the carjacking conviction (§ 215), in which Ruiz was the named victim; (3) the robbery conviction (§ 211), in which Wharff was the named victim; (4) the attempted robbery conviction (§§ 211, 664), in which Hebda was the named victim; (5) the robbery conviction (§ 211), in which White was the named victim; and (6) the true findings that defendant personally used a deadly or dangerous weapon in the commission of the (a) robbery of Ruiz, (b) attempted carjacking of Thomas, and (c) carjacking of Ruiz (§ 12022, subd. (b)(1)).

#### 2. *STANDARD OF REVIEW*

When determining whether the record includes sufficient evidence, "'"'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citation.] In conducting such a review, we '"presume[] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citations.] 'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the

credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.'" (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

### 3. *ATTEMPTED CARJACKING OF THOMAS*

We examine whether there is substantial evidence to support defendant's conviction for the attempted carjacking of Thomas (§§ 215, 664).

Carjacking is the taking of a motor vehicle that is possessed by another person, from his or her person or immediate presence, against the person's will, and with the intent to either permanently or temporarily deprive the person of his or her possession of the vehicle, accomplished by means of force or fear. (§ 215.) "Attempt consists of (1) a specific intent to commit a crime and (2) a direct but ineffectual act done toward its commission." (*People v. Marquez* (2007) 152 Cal.App.4th 1064, 1067.)

Defendant takes issue with the evidence supporting the elements of (a) immediate presence, and (b) force or fear.

#### a) Immediate Presence

We address the immediate presence element first. "[S]omething is in a person's 'immediate presence' if it is ""'so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it.""" [Citation.] 'Under this definition, property may be found to be in the victim's immediate presence "even though it is located in another room of the house, or in another building on [the] premises."'" (*People v. Johnson* (2015) 60 Cal.4th 966, 989

8

(*Johnson*).) "Normally, in order to accomplish a carjacking, the perpetrator must take not only the car itself but the keys to the car." (*Id.* at p. 990.)

In *Johnson*, the victim typically parked her car in her garage, which was accessible from her house through a breezeway. (*Johnson*, *supra*, 60 Cal.4th at p. 972.) The victim usually left her car keys on her kitchen counter. (*Ibid.*) The victim was killed, her home ransacked, and her car taken. The victim's body was found in her house, and there was cookie dough in the kitchen, indicating she had been baking cookies. (*Id.* at p. 973.) The Supreme Court explained the jury could reasonably find the car keys had been within the victim's reach when the defendant arrived at her door, and therefore, the keys and the car were within her immediate presence. (*Id.* at p. 990.)

Thomas took a shower in the bathroom, and then walked into the hallway. Thomas saw a person in his bedroom and the point of a knife. Thomas returned to the bathroom and hid. Defendant instructed Thomas to exit the bathroom, in order to be tied up. Thomas refused. Defendant tied the bathroom door shut. Defendant demanded the keys to Thomas's car through the bathroom door. Thomas's car was "parked right out front." The keys to the car were in Thomas's bedroom. Thomas's bedroom was ransacked.

A reasonable trier of fact could find that Thomas was walking toward his bedroom, from the shower, when he was prevented from entering the room due to defendant holding a knife. Therefore, but for defendant, Thomas would have been in the bedroom within reach of his car keys. Thomas was prevented from retaining control over the keys by fear of defendant and the knife. Given this evidence, a jury could

9

reasonably conclude defendant attempted to take the keys from Thomas's immediate presence. Accordingly, we conclude substantial evidence supports the immediate presence element.

### b)   Force or Fear

We now turn to the force or fear element of the offense. "When the People rely upon the use of fear, rather than force, it 'is not necessary that there be direct proof of fear.' [Citation.] The use of fear may be inferred from the circumstances." (*People v. Gomez* (2011) 192 Cal.App.4th 609, 623 [Fourth Dist., Div. Two], fn. omitted.)

As set forth *ante*, Thomas was leaving the bathroom after his shower when he saw a figure in his bedroom holding a knife. Upon seeing the figure, Thomas hid in the bathroom. A jury could reasonably infer from this evidence that Thomas hid because he was scared, which meant Thomas was prevented from controlling his keys due to fear. Additionally, Thomas told Riverside County Sheriff's Deputy Grotefend that he stayed in the bathroom because he feared being attacked by defendant. This evidence provides credible support for the finding that defendant was afraid.

Further, Thomas heard defendant punching Ruiz and dragging Ruiz down the hallway. Defendant told Thomas that defendant was tying up Ruiz. Defendant instructed Thomas to exit the bathroom, but Thomas refused. A reasonable jury could infer Thomas refused because he was scared. Thus, there is further support for the finding that Thomas was prevented from retaining control over his keys due to fear. Additionally, Thomas said to defendant, "'Don't kill the man [(Ruiz)] 'cause the man is all right. Just get what you want to and just leave." This evidence provides further

10

support that Thomas was in fear for his safety and Ruiz's safety, and that Thomas was prevented from remaining in control of his keys due to fear. Accordingly, based upon the foregoing evidence, we conclude there is substantial evidence supporting the "force or fear" element.

### 4. *CARJACKING OF RUIZ*

Defendant contends there is not substantial evidence to support the "'immediate presence'" element of the carjacking offense involving Ruiz.

As explained *ante*, "[S]omething is in a person's 'immediate presence' if it is ""'so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it.'"""" (*Johnson*, *supra*, 60 Cal.4th at p. 989.)

Ruiz was sleeping when defendant punched him. Ruiz was rendered unconscious while defendant continued to punch him. Defendant dragged Ruiz from Ruiz's bedroom into the hallway. Ruiz left his car keys on a table in his bedroom. The table is near Ruiz's bed.

Defendant contends that because Ruiz was asleep and then knocked unconscious, the car keys were not in Ruiz's immediate presence. When discussing the "force and fear" element of robbery, our Supreme Court has explained, "'[I]t is settled that a victim of robbery may be unconscious or even dead when the property is taken, so long as the defendant used force against the victim to take the property.'" (*People v. Abilez* (2007) 41 Cal.4th 472, 507.) Our Supreme Court, in comparing the crimes of robbery and carjacking, has explained that carjacking is "more nearly a crime against the person than

11

a crime against property." (*People v. Hill* (2000) 23 Cal.4th 853, 860.) The high court concluded the force and fear element of carjacking can be committed against an unconscious possessor or occupant of a vehicle. (*Id.* at pp. 860-861.)

If defendant's argument were correct, that the "immediate presence" element of carjacking cannot be met if the victim is unconscious, then that would effectively create a loophole around the Supreme Court's holding in *Hill*. We extrapolate from the *Hill* decision the rule that a defendant cannot render a victim unconscious so as to defeat the elements of the carjacking offense. So, defendant's act of punching Ruiz while Ruiz slept, and then rendering Ruiz unconscious, will not act to defeat the "immediate presence" element. Ruiz's keys were in the bedroom where Ruiz was located. Ruiz, had he not been knocked unconscious by defendant's attack, would have been able to reach the keys. Therefore, given the location of the keys and Ruiz, we conclude there is substantial evidence supporting the "immediate presence" element.

5. *ROBBERY OF WHARFF*

Defendant contends there is a lack of substantial evidence to support his conviction for robbing Wharff. "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) Defendant asserts there is a lack of evidence supporting the (1) immediate presence, and (2) force or fear elements.

The "immediate presence" element is explained *ante*—carjacking and robbery have similar definitions of "immediate presence." (*Johnson, supra,* 60 Cal.4th at p. 989.) However, for ease of reference, with respect to robbery, an object is within a

victim's immediate presence when it is """"so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it.""""" (*People v. Abilez*, *supra*, 41 Cal.4th at p. 507.)

When Rincon exited the store, she "heard an elderly lady yelling, 'He's got my purse, he's got my purse.'" Rincon saw defendant running away from the elderly lady, Wharff, holding a purse, and Wharff was pointing at defendant. Wharff was standing "in the middle of the street, like, where the parking is"; "[s]he was nowhere near a car," and Wharff was walking into the store, so she did not yet have a shopping cart. Wharff was "frail-looking and could barely walk." Defendant was approximately 10 feet away from Wharff when Rincon saw him.

A jury could reasonably infer from the foregoing evidence that defendant took Wharff's purse from her person. Wharff could not walk well, defendant was only 10 feet away from her, and Wharff was standing in the middle of the street. Thus, a trier of fact could logically deduce that Wharff was holding her purse at the time defendant took it because Wharff would not have had the speed to run into the middle of street. For example, Wharff was not next to her open car door, from which one might think defendant could have taken the purse from the car. Rather, given the evidence, the reasonable conclusion is that defendant took Wharff's purse from her person, and thus, from her immediate presence. Accordingly, we conclude there is substantial evidence to support the "immediate presence" element.

Next, we turn to the force or fear element. "Courts have recognized that the 'force' required for robbery is not necessarily synonymous with a physical corporeal

13

assault. [Citation.] An assault consists of an attempt coupled with the present ability to inflict an 'injury' unlawfully on another; this 'injury' can be the least unwanted touching. [Citation.] When actual force is present in a robbery, at the very least it must be a quantum more than that which is needed merely to take the property from the person of the victim, and is a question of fact to be resolved by the jury taking into account the physical characteristics of the robber and the victim." (*People v. Wright* (1996) 52 Cal.App.4th 203, 210, fn. omitted.)

Wharff did not testify at trial. The evidence concerning Wharff was primarily provided via the testimony of Rincon and Abbate. When Rincon saw defendant sitting in his car, on her way into the store, she noticed he was male and his age range was "20s, 30s." After defendant took Wharff's purse, he was running with the purse. Wharff was "frail-looking and could barely walk." Rincon estimated Wharff was in her 70s. Abbate thought Wharff appeared "shooken up" and "quite upset" after the robbery.

Given the differences in defendant's and Wharff's ages and physical abilities, the jury could reasonably infer defendant used force when taking Wharff's purse, especially given Wharff's lack of mobility. The evidence reflecting defendant was running shows he likely did not use lesser force for the weaker Wharff. Further, the jury could reasonably find from the evidence that defendant caused Wharff to be in fear, due to the evidence reflecting Wharff was emotionally shaken and upset. Accordingly, there is substantial evidence supporting the "force or fear" element.

14

### 6.	*ATTEMPTED ROBBERY OF HEBDA*

Defendant contends there is not substantial evidence supporting the finding that he attempted to rob Hebda. In particular, defendant asserts there is no evidence he (1) attempted to take anything from Hebda, and (2) intended to take anything from Hebda.

"[T]o be convicted of attempted robbery, the perpetrator must harbor a specific intent to commit robbery and commit a direct but ineffectual act toward the commission of the crime. [Citation.] The jury may infer a defendant's specific intent to commit a crime from all of the facts and circumstances shown by the evidence." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

Hebda did not testify at trial. The evidence concerning Hebda was primarily introduced via the testimony of Cuellar, who was performing maintenance work at the retirement community on the day of the attack, and Abbate. Cuellar witnessed defendant drive into the retirement community behind Hebda. Defendant then followed Hebda into a stairwell. An employee of the retirement community found Hebda beaten in the stairwell. Abbate observed that Hebda "had been punched multiple times in the face so his face was completely swollen and black and blue," and Hebda was "extremely shaken up from the entire thing." Cuellar witnessed defendant try to open Hebda's car door after the attack. Cuellar did not see defendant use a key when trying to open the car, but defendant was using two hands to try to open the door. When Abbate arrested defendant, he found keys in defendant's possession, which could have belonged to Hebda, but Abbate was unsure of the keys' owner.

The foregoing is credible evidence from which a trier of fact could reasonably infer defendant beat Hebda in order to steal Hebda's property, in particular, his car and car keys. The evidence that defendant (1) followed Hebda, (2) tried to open Hebda's car door, and (3) was in possession of keys that could have belonged to Hebda, suggests defendant wanted more than to merely physically attack Hebda—defendant intended to take property as well. As a result, the jury could reasonably conclude defendant had the intent to steal Hebda's property at the time he attacked Hebda, thus providing substantial evidence of intent. Further, the evidence that Hebda was beaten, defendant tried to open Hebda's car door, and defendant was in possession of keys that may have belonged to Hebda supports a finding that defendant attempted to take Hebda's property. Accordingly, we conclude substantial evidence supports defendant's conviction for the attempted robbery of Hebda.

7. *ROBBERY OF WHITE*

Defendant contends there is a lack of substantial evidence that he robbed White, at the Ross store. In particular, defendant asserts there is not substantial evidence that he used fear to prevent White from stopping him when he stole the shoes. Thus, defendant contends he committed theft, but not robbery.

"Robbery is larceny with the aggravating circumstances that 'the property is taken from the person or presence of another' and 'is accomplished by the use of force or by putting the victim in fear of injury.'" (*People v. Anderson* (2011) 51 Cal.4th 989, 994.)

16

Defendant picked-up a pair of shoes and walked to the front of the store, where White was located. White was behind a cash register speaking with a store associate. Defendant held out the shoes to White, looked directly at her, and said, "'I'm taking these fucking shoes and there's not a damn thing you could do about it.'" White felt defendant made the statement because he wanted to intimidate her. White told Abbate that defendant's statement caused her to be afraid for her safety. White explained that Ross's store policy is to not chase or follow thieves out of the store. Rather, the policy is to say, "'Excuse me,'" to the person who appears to be stealing. After defendant made his comment to White, White responded, "'Have a good night.'"

The foregoing is credible evidence from which a trier of fact could find defendant exited the store with the stolen shoes by virtue of causing White to be fearful. From the evidence, one could reasonably find that, but for defendant's comment causing White to be scared, White would have spoken to defendant further. White would have said, "Excuse me," and spoken to defendant about the shoes. Instead, defendant's comment caused White to be scared, which in turn caused White to merely say "good night" to defendant, thus permitting defendant to accomplish the theft. Accordingly, there is substantial evidence supporting the finding that defendant accomplished the theft by putting White in fear.

8.    *WEAPON ENHANCEMENTS*

Defendant contends there is a lack of substantial evidence supporting the weapon enhancement (§ 12022, subd. (b)(1)), concerning the knife, for the crimes of (1) attempting to carjack Thomas; (2) robbing Ruiz; and (3) carjacking Ruiz.

17

The weapon enhancement adds an additional prison term for "[a] person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony." (§ 12022, subd. (b)(1).) "[A] defendant uses a [weapon] 'in the commission' of a crime when he or she employs the [weapon] to neutralize the victim's companions, bystanders, or other persons who might otherwise interfere with the successful completion of the crime." (*People v. Granado* (1996) 49 Cal.App.4th 317, 330.)

Thomas saw defendant with a knife, and responded by locking himself in the bathroom. Thomas was scared and frightened. Thomas said to defendant, "'Don't kill the man [(Ruiz)] 'cause the man is all right. Just get what you want to and just leave." The foregoing is credible evidence from which a trier of fact could find defendant used the knife to stop Thomas from fighting against defendant's efforts to take Thomas's property. The knife was displayed in a manner that caused Thomas to be fearful and lock himself away where he could not protect his belongings, such that defendant was better able to access Thomas's car and/or car keys. Given this evidence, we conclude there is substantial support for the finding that defendant personally used a deadly or dangerous weapon in the attempted carjacking of Thomas.

Defendant punched Ruiz to the point where Ruiz was unconscious. When Ruiz awoke, his wrists were bound, and he saw defendant walking through the house, taking objects, and holding a knife. Ruiz explained, "Well, I was afraid of the knife. Nobody could say anything because he was holding a knife." Ruiz said he did not protest

18

defendant taking his car because defendant was holding the knife. Defendant loaded items into Ruiz's car, and left with the car.

The foregoing is credible evidence reflecting defendant used the knife in robbing and carjacking Ruiz because the knife permitted defendant to accomplish the crimes without protest from Ruiz. Ruiz was so neutralized by the knife that he did not even try speaking with defendant. Given Ruiz's testimony, we conclude there is substantial evidence supporting the finding that defendant personally used a deadly or dangerous weapon in the carjacking and robbery of Ruiz.

B.      GRAND THEFT INSTRUCTION

Defendant contends the trial court erred by failing to instruct the jury on the lesser included offense of grand theft in regard to the robbery of Wharff.

A trial court is required to instruct on a lesser included offense "'whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.] "Substantial evidence" in this context is "'evidence from which a jury composed of reasonable [persons] could . . . conclude[]'" that the lesser offense, but not the greater, was committed. [Citations.]' [Citation.] Instructions on lesser included offenses should be given 'when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.'" (*People v. Campbell* (2015) 233 Cal.App.4th 148, 162.)

Grand theft is a lesser included offense of robbery. When there is no evidence of force and fear in the taking of property from the person of another, then a defendant has

19

committed grand theft, rather than robbery. (*People v. Jones* (1992) 2 Cal.App.4th 867, 869; see also former § 487, subd. (c).) As explained *ante*, "[c]ourts have recognized that the 'force' required for robbery is not necessarily synonymous with a physical corporeal assault." (*People v. Wright*, *supra*, 52 Cal.App.4th at p. 210.) "When actual force is present in a robbery, at the very least it must be a quantum more than that which is needed merely to take the property from the person of the victim, and is a question of fact to be resolved by the jury taking into account the physical characteristics of the robber and the victim." (*Ibid.*)

When Rincon saw defendant sitting in his car, on her way into the store, she noticed he was male and his age range was "20s, 30s." After defendant took Wharff's purse, he was running with the purse. Wharff was "frail-looking and could barely walk." Rincon estimated Wharff was in her 70s. Abbate thought Wharff appeared "shooken up" and "quite upset" after the robbery.

The foregoing evidence leads to the conclusion that defendant used force when taking Wharff's purse. Given the age difference between defendant and Wharff, Wharff's lack of mobility, defendant's act of running, and Wharff's emotional response, the logical inference is that defendant used more force than was necessary to merely take Wharff's purse. The reasonable inference from the evidence is that defendant was moving far faster than Wharff could respond and his forcible actions overwhelmed her, leaving her emotionally distraught. The evidence does not support an inference that defendant took Wharff's purse without force or fear. The circumstantial evidence does not support a finding that the theft was committed with the least force necessary. In

20

other words, given the evidence, the jury would have either found defendant guilty of robbery or innocent—there was no evidence supporting a finding of a lesser theft, such as grand theft. Accordingly, we conclude the trial court did not err by not instructing the jury on the offense of grand theft.

## C. STEALING AND RECEIVING INSTRUCTION

Defendant contends the trial court erred by failing to instruct the jury that defendant could not be convicted of both stealing (§ 211) and receiving (§ 496, subd. (a)) the same property. Defendant was convicted of both stealing (Count 8) and receiving (Count 10) the property from Wharff's purse, as well as the shoes from Ross (Counts 15 & 16). The People concede defendant is correct.

The statute prohibiting one from receiving stolen goods provides, "[N]o person may be convicted both pursuant to this section and of the theft of the same property." (§ 496, subd. (a).) Accordingly, defendant's convictions for (1) receiving the stolen property from Wharff's purse (§ 496, subd. (a)) (Count 10), and (2) receiving the stolen shoes (§ 496, subd. (a)) (Count 16) must be reversed because defendant cannot be convicted of stealing and receiving the same property.

## D. SECTION 654

### 1. *BACKGROUND*

In Count 1, defendant was convicted of assaulting Ruiz by means of force likely to produce great bodily injury. (§ 245, subd. (a)(4).) In Count 2, defendant was convicted of robbing Ruiz. (§ 211.) In Count 4, defendant was convicted of carjacking Ruiz. (§ 215, subd. (a).) In Count 5, defendant was convicted of falsely imprisoning

21

Ruiz. (§ 236.) In Count 18, defendant was convicted of driving or taking Ruiz's car without Ruiz's permission.

The trial court found Count 18 arose out of the same operative facts underlying the carjacking conviction (Count 4), and therefore stayed the sentence for Count 18. (§ 654.) For Counts 1, 2, 4, and 5, the trial court imposed consecutive sentences, finding the crimes "do not arise out of the same set of operative facts, different circumstances."

2. *ANALYSIS*

Defendant contends the trial court erred by not staying the sentences for the carjacking (Count 4) and false imprisonment (Count 5) convictions. (§ 654.)

Section 654, subdivision (a), provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." This prohibition on multiple punishments extends to an indivisible course of conduct. (*People v. Leonard* (2014) 228 Cal.App.4th 465, 498.) "'"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."'" (*Id.* at pp. 498-499.)

"'If [a defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for

22

independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (*People v. Leonard*, *supra*, 228 Cal.App.4th at p. 499.) We apply the substantial evidence standard of review. (*Ibid.*)

In Count 1, defendant was convicted of assaulting Ruiz by means of force likely to produce great bodily injury. (§ 245, subd. (a)(4).) When defendant was incarcerated, he sent letters to Ruiz requesting that Ruiz hold defendant's social security checks. Ruiz received the checks, but returned them to the Social Security Administration. Ruiz awoke to being punched by defendant. Thomas, who was locked in the bathroom, heard defendant punch Ruiz, drag Ruiz into the hallway, and ask Ruiz for defendant's social security checks and mail. When Abbate arrived, the house appeared to have been ransacked. The evidence supports a finding that defendant's objective in punching Ruiz was to intimidate Ruiz into disclosing the location of the checks, or to render Ruiz unconscious while defendant searched the house for the checks.

In Count 2, defendant was convicted of robbing Ruiz. (§ 211.) Ruiz estimated defendant was in the house for approximately three hours. Ruiz saw defendant taking jackets, pants, shirts, and a backpack. Defendant was drinking a soda and making multiple trips from the house to the car as he carried things away. The foregoing evidence supports a finding that after defendant realized his checks were not at the house, he switched objectives. Defendant's new objective was to take property belonging to Ruiz. In other words, defendant's objective changed from recovering his own property (his social security checks and mail) to taking Ruiz's property, perhaps as

23

punishment for not retaining the checks. Thus, defendant had a separate objective in robbing Ruiz.

In Count 4, defendant was convicted of carjacking Ruiz. (§ 215, subd. (a).) Defendant first attempted to carjack Thomas; however, upon learning of the mechanical issues with Thomas's car, defendant elected to carjack Ruiz. Defendant placed the stolen items in Ruiz's car and left in the car. From the foregoing evidence one could reasonably conclude that defendant's objective in taking Ruiz's car was to have a means to escape the scene of the crime. Therefore, defendant's objective changed from taking Ruiz's property as a means of punishment to taking Ruiz's car in order to have the means to flee. Thus, defendant had a separate objective in carjacking Ruiz.

In Count 5, defendant was convicted of falsely imprisoning Ruiz. (§ 236.) Defendant bound Ruiz's wrists. At the time defendant bound Ruiz's wrists, Ruiz was unconscious. Thus, binding Ruiz's wrists was unnecessary in terms of committing the robbery or carjacking. Defendant could have accomplished the robbery and carjacking while Ruiz was unconscious. (See *People v. Foster* (1988) 201 Cal.App.3d 20, 27-28 [section 654 is inapplicable where false imprisonment is not necessarily incidental to committing the robbery].) Instead, the evidence supports a finding that defendant bound Ruiz's wrists so that defendant could leisurely stay in the house. Ruiz testified defendant was in the house for approximately three hours. Thus, defendant's objective in binding Ruiz's wrists was staying in the house for an extended period of time—a separate objective from the assault, robbery, and carjacking. Accordingly, we conclude substantial evidence supports the trial court's decision to not apply section 654.

E.      COMPETENCY

    1.      *BACKGROUND*

Defendant's competency was put at issue on the date of his arraignment,
November 1, 2010.  The trial court suspended the proceedings (§ 1368) and ordered two
doctors, Dr. Oshrin and Dr. Suitor,[4] to evaluate defendant.  On December 13, the trial
court announced it received reports from the two doctors:  one doctor found defendant
competent, and the other opined defendant was incompetent.  The trial court ordered a
third doctor, Dr. Rath, to evaluate defendant.  On February 22, 2011, the court said Rath
had concluded defendant is incompetent.  The trial court found defendant was
incompetent, and ordered him committed in order to regain his competency.

In October 2011, the trial court noted Rath had again concluded defendant was
incompetent.  The court found defendant was incompetent and ordered he be
involuntarily medicated because defendant threatened to have his attorney killed.  The
court ordered defendant placed in Patton State Hospital.

On February 8, 2013, the trial court gave a summary of some of the events in
defendant's case.  The court explained that, in October 2012, it received a certificate of
competence certifying defendant was competent.  The certificate was signed by Dr.
Christensen of Patton.  Also in 2012, the trial court received a report from Sean

---

    **4**  In the reporter's transcript, Dr. Suitor's name is spelled two ways:  Suitor and
Suiter.  We have elected to use the Suitor spelling.

Brandon,[5] a psychologist, and Leigh Lindsay, a psychiatrist, which referenced Dr. Oshrin, who opined defendant was a malingerer, which means a person who exaggerates or fakes psychological symptoms in order to gain some benefit, such as a single-person cell. Rath also reported defendant was a malingerer. Suitor opined defendant was incompetent. Thus, on February 8, the trial court held an evidentiary hearing regarding defendant's competence.

Defendant testified at the hearing. Defendant explained his attorney's job is to help him by "[f]ight[ing] the case." Defendant said he did not want to take medication because it "messes" with his power to read minds. Defendant explained that he needed to be able to read minds because there were people chasing after him. Defendant said the doctor's purpose was to "[e]ntrap [defendant] by getting [him] to take medication that is stopping [his] brain." Defendant accused his attorney of being "a spy for the government." Defendant said the prosecutor's job was to "gain information and spy."

Rath, a clinical and forensic psychologist, also testified at the hearing. Rath met with defendant three times in 2011 for a total of approximately four hours. Defendant was unmedicated during the meetings. Rath also observed defendant during the court hearing (on February 8) and reviewed defendant's prison mental health records. Rath explained that defendant had been diagnosed as paranoid schizophrenic; bipolar, which included becoming psychotic; having an antisocial personality disorder; and malingering. Defendant had been on "over a dozen different psychiatric medications

_____

[5] The record reflects the doctor's last name is Brandon; however, we infer from context in the record that it is likely Dr. Brannon, who will be discussed *post*.

26

and anti-psychotic medications, mood stabilizing medications." A person can malinger and at the same time have a genuine mental disorder. For example, in 2004, defendant admitted he was agitating his auditory hallucinations in order to get into an enhanced outpatient program. So, according to Rath, defendant suffered genuine mental health issues, but also malingered.

Rath opined that defendant was not competent to stand trial due to defendant's delusions, such as defendant believing he has a microchip in his head. Rath believed defendant would not be able to assist with his defense because defendant thought the case was defendant "against the world," rather than "prosecution verses defense."

Rath explained that doctors had "vastly disagree[d]" about defendant's diagnosis—"some doctors and clinicians saw him malingering, and some saw him as severely mentally ill." Rath said "[e]verybody" agreed defendant has antisocial traits, which could cause defendant to be manipulative and have a higher incidence of malingering.

Sean Brannon, an admitting neuropsychologist at Patton, was the third witness at the hearing. Brannon had responsibility for a share of the competency cases at Patton. Defendant was admitted to Patton in October 2012. Brannon reviewed the intake report from when defendant was admitted. The attending psychiatrist noted that, when asked, defendant said he could not recall the colors of the American flag, which indicated to the doctors that defendant was "playing dumb."

Brannon conducted a psychiatric symptoms assessment on defendant. Brannon reviewed the symptoms defendant had complained of when speaking with Oshrin and

Suitor. Brannon noted the symptoms of which defendant complained "were inconsistent with each other in between sessions and even within the—the same session." For example, defendant would deny having visual hallucinations, but then, at a different time, would complain he saw toy trucks. Brannon explained that "bonafide psychiatric patients do not produce inconsistencies like that," so the inconsistencies indicate a person was faking their symptoms.

Brannon observed defendant for "[a]t least 12 hours." Brannon administered the SIRS test to defendant, which was an inventory of reported symptoms. The test included extremely rare psychological symptoms, so if a test subject claimed to be suffering from an extremely rare symptom, that indicated the person was actively trying to show they had a psychiatric problem. Defendant reported suffering "many improbable and absurd symptoms," and there were multiple inconsistencies in his answers. Brannon said he had administered the test at least 1,200 times in his career, and defendant "scored one of the highest malingering scores [Brannon had] seen." The test result reflected defendant was malingering "to an extremely high medical certainty."

Brannon explained that defendant suffered antisocial personality traits, which meant defendant was angry, but did not mean defendant was incompetent. Further, defendant had told Brannon and a second doctor that he did not want to take his medication because "he would quote, 'get better and be returned to court.'" Brannon found defendant's reasoning to be "very logical." Brannon believed defendant's explanation regarding medication showed "he's thinking about his case and the steps

28

that he needs to take that are necessary in order to stop his case, delay his case, to benefit himself."

Brannon explained that he and the Patton "treatment team" believed defendant was competent to stand trial. Brannon's opinion was based upon (1) defendant's behavior being inconsistent with the symptoms defendant claimed to be experiencing; (2) defendant being diagnosed as malingering by three different doctors; and (3) defendant demonstrating a good memory and having "functional abilities."

The trial court found that defendant "has some problems," but questioned whether that equated with a lack of competence. The court remarked that defendant understood the questions asked of him, he responded accordingly to the questions, and defendant appeared "somewhat intelligent, well-spoken, and articulate." The court found it significant that defendant had one of the highest malingering scores that Brannon had ever seen on the SIRS test. The court also believed defendant's comments about not taking medication so as to avoid court "show[ed] a great deal of logic." The court found the "more compelling and more persuasive" evidence reflected defendant was competent to stand trial. The trial court found defendant to be competent and certified and approved the certificate of mental competence.

2. *ANALYSIS*

Defendant contends the trial court violated his state and federal due process rights by finding him competent to stand trial.

The conviction of an accused person while he is legally incompetent violates due process. (*Medina v. California* (1992) 505 U.S. 437, 449.) The federal test for

29

determining competence to stand trial is "'whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'" (*Dusky v. U.S.* (1960) 362 U.S. 402, 402.)

The state has a similar standard: "A defendant is mentally incompetent for purposes of this chapter if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner." (§ 1367, subd. (a).)

At a competency hearing, the burden is on the defendant. There is a presumption the defendant is mentally competent, unless the defendant proves by a preponderance of the evidence that he is mentally incompetent. (§ 1369, subd. (f); *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1513; *Medina v. California*, *supra*, 505 U.S. at pp. 452-453.)

"We review a trial court's determination of competency for substantial evidence, viewing the evidence in the light most favorable to that determination." (*People v. Kirvin*, *supra*, 231 Cal.App.4th at p. 1514.) "It is 'not the role of this court to redetermine the credibility of experts or to reweigh the relative strength of their conclusions.'" (*Ibid.*) Additionally, "a single witness may establish any fact." (*Ibid.*)

Brannon testified that defendant was competent to stand trial. Brannon's opinion was based upon (1) defendant's behavior being inconsistent with the symptoms defendant claimed to be experiencing; (2) defendant being diagnosed as malingering by three different doctors; and (3) defendant demonstrating a good memory and having

30

"functional abilities." Brannon had observed defendant for 12 hours, reviewed the symptoms defendant had complained of when speaking with Oshrin and Suitor, and administered the SIRS test to defendant.

The foregoing evidence reflects Brannon spent a meaningful amount of time with defendant and considered defendant's history prior to forming an opinion about defendant's competency. Therefore, Brannon's opinion regarding defendant's competency is credible because it was based upon Brannon spending a meaningful amount of time observing defendant.

Further, when defendant testified, he explained his attorney's job was to help him by "[f]ight[ing] the case." Defendant also appeared to understand the questions being asked of him by his attorney, the prosecutor, and the trial court. As a brief example:

"[Defense Counsel:] So we're talking about when you are in prison, and the medication you were taking. [¶] And you said that you were on some medication; is that right?

"[Defendant:] Yeah.

"[Defense Counsel:] But you don't remember what the medication was for?

"[Defendant:] No.

"[Defense Counsel:] How did that medication make you feel?

"[Defendant:] Uh, drowsy, down, slow.

"[Defense Counsel:] And is that why you don't want to take it?

"[Defendant:] I already told you it messes with my mind. You know, what I'm saying? It—it messes with my mind, with—with what I got going on my mind [*sic*]."

31

Defendant's testimony shows he is able to understand questions from his attorney, give informative responses, and recall his prior responses (e.g., "I already told you"). Given defendant's and Brannon's testimonies, there is reasonable and credible evidence supporting the trial court's finding that defendant was competent to stand trial. Accordingly, we conclude the trial court did not err.

Defendant argues, "Dr. Brannon's opinion simply did not overcome Dr. Rath's opinion that [defendant] was in fact incompetent to stand trial." As explained *ante*, Brannon spent approximately 12 hours observing defendant, so his opinion is credible. The trial court resolved the conflict between Rath's and Brannon's opinions by crediting Brannon's opinion. "It is 'not the role of this court to redetermine the credibility of experts or to reweigh the relative strength of their conclusions.'" (*People v. Kirvin*, *supra*, 231 Cal.App.4th at p. 1514.) Accordingly, we are not persuaded by defendant's assertion that Rath's testimony was stronger than Brannon's testimony.

## DISPOSITION

The convictions for receiving stolen property (§ 496, subd. (a)), in Counts 10 and 16 are reversed. The trial court is directed to prepare an amended determinate abstract of judgment removing Count 16 (§ 496, subd. (a)).[6,7] The trial court is directed to

---

[6] Citing section 654, the trial court did not impose a sentence for Count 10. Accordingly, the determinate abstract of judgment does not include a sentence for Count 10.

[7] The determinate abstract of judgment incorrectly reflects Count 16 consisted of a violation of section 296, subdivision (a), as opposed to section 496, subdivision (a).

forward the amended abstract of judgment to the appropriate agency/agencies.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER

J.

We concur:

RAMIREZ

P. J.

McKINSTER

J.