Filed 2/16/23  P. v. Allen CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077868 |
| v. | (Super. Ct. No. INF1800930) |
| JAON JAMES ALLEN, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Otis Sterling III, Judge.

Affirmed.

Jennifer A. Gambale, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland , Assistant Attorney General, Melissa Mandel and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

While demanding money, defendant and appellant Jason James Allen attacked his roommate, J.B., with a baseball bat, causing J.B. severe, extensive, and permanent injuries. A jury convicted defendant of various offenses and he was sentenced to a term of 15 years, eight months, plus a term of seven years to life.

Defendant argues insufficient evidence supports his robbery conviction, the trial court erroneously instructed the jury on lesser included offenses and denied his *Marsden*[1] motion, and his trial counsel violated his Sixth Amendment rights by conceding he was guilty of two charges. We affirm.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant and J.B. met in early 2018. Defendant was having financial troubles, so J.B. offered his spare bedroom to defendant for $100 per week. They lived together for a few months without any problems until J.B. thought defendant "started going downhill." Defendant lost his job and was just laying around all day. J.B. had loaned defendant money several times and felt like he had become "more or less like an ATM" for defendant.

---

[1] See *People v. Marsden* (1970) 2 Cal.3d 118.

J.B. eventually could no longer help defendant financially because the house was being sold and J.B. needed to save up as money as he could for the move. J.B. kept $3,500 in case in his wallet and some money in his kitchen drawer. He told defendant he wanted to buy a new truck and carried cash on him in case he saw one he wanted to buy, but told defendant he only had $1,500 because he did not want defendant to know how much he had saved.

One evening in May 2018, defendant's car would not start and accused J.B. of "'messing with it.'" J.B. denied the accusation and told defendant that he had been living in J.B.'s house for five months and was free to leave if he thought J.B. was messing with his car.

After their brief argument, defendant went to his bedroom. About 40 minutes later, defendant apologized to J.B. and acknowledged that J.B. had done a lot for him. Defendant said he did not want to go to bed angry and asked for a hug. They hugged, and J.B. thought the problem had been "squashed." Both of them went to bed shortly afterward.

Around 3:00 a.m. the next morning, J.B. woke up to the sound of breathing and defendant on top of him. Defendant then hit J.B. twice in the forehead with an aluminum baseball bat. J.B. tried to get up, but defendant kept hitting him with the bat "over and over." Defendant hit J.B. by lifting his arms up and striking downward as well as by swinging the bat from the left to right.

J.B. began feeling dizziness past the point of pain, yet defendant kept hitting him. J.B. tried to push defendant away with his foot, but defendant hit him in the leg repeatedly and broke his leg. J.B. tried using his other foot, but defendant broke his foot by hitting it with the bat.

J.B. tried to escape but slipped on his blood. Defendant hit J.B. on his head, pacemaker, ribs, and testicles. Defendant told J.B., "'You shouldn't have made me mad. Now I have to kill you.'" and "'You're going to die.'" Defendant kept hitting J.B. with the bat "anywhere and everywhere he could." At one point, defendant had to stop and catch his breath.

Defendant then asked J.B. where his keys were. J.B. said they were on his nightstand and told defendant to take them and leave. Defendant grabbed the keys and said he wanted J.B.'s money. J.B. said his money was not in the house, but defendant said he knew J.B. had money on him to buy a truck and demanded "[t]he money in [J.B.'s] wallet." Defendant then said, "'I want your money now, or I'm going to make your death really painful.'"

Fearful for his life, J.B. told defendant the money was in the kitchen drawer. Defendant dragged J.B. toward the kitchen, but he was able to escape. J.B. went to his neighbors' house while yelling for help. When his neighbors answered their door, J.B. repeatedly asked for help and said, "'[m]y roommate just beat me with a baseball bat.'" They helped J.B. inside and called 911. J.B. was covered in his blood and looked like he

was in shock and was going to lose consciousness. He told his neighbors that his roommate had "taken off" with his car and money.

When law enforcement searched J.B.'s home, they found an aluminum baseball bat with dried blood on it. There was a large amount of blood on J.B.'s bed and some on his bedroom walls. J.B.'s car was missing and his wallet was on the floor next to his bed with no money in it. J.B. usually kept his money in the kitchen drawer or the top drawer of nightstand next to his bed, which law enforcement observed was partially open.

Defendant's cell phone was traced to Modesto, where J.B.'s car was later found in a parking lot. Defendant's cell phone records showed he was traveling north, and he was eventually arrested in Washington.

J.B. was hospitalized for 10 days. He suffered multiple injuries, including: a skull fracture that required nine staples in the back of his head; a broken back; a broken nose; a facial fracture and a pushed-in eye socket; a fractured elbow; a broken finger and hand; bruises all over the front and back of his entire body; a broken leg; head lacerations; and an ear ripped in half; and a ruptured testicle. He required several surgeries, including one to remove a testicle, and a blood transfusion. J.B. also suffered anemia because of acute blood loss.

J.B. was left with permanent injuries. He has several scars, including a large one across the back of his head. Part of his ear is also missing and one of his fingers is permanently disfigured. Because of his finger injury, J.B. can no longer work as a painter. He cannot bend over or squat down all the way, and his foot hurts if he works

5

for more than a couple of hours. J.B. frequently gets dizzy and has trouble connecting his thoughts and talking. He also suffers from anxiety and panic attacks and is "paranoid" about being attacked at home.

A jury convicted defendant of attempted premediated murder (Pen. Code, §§ 664, 187, subd. (a)[2]; count 1), torture (§ 206; count 2), carjacking (§ 215; count 3), robbery (§ 211; count 4), and aggravated mayhem (§ 205; count 5). The jury also found true the allegations that defendant personally inflicted great bodily injury during the commission of counts 1, 3, and 4, and that he personally used a deadly and dangerous weapon, a metal bat, (§ 12022, subd. (b)(1)) during the commission of all five counts. The trial court sentenced defendant to a determinate term of 15 years and eight months followed by an indeterminate term of seven years to life in state prison.

III.

DISCUSSION

Defendant argues (1) substantial evidence does not support his robbery conviction, (2) the trial court failed to instruct the jury on battery causing serious bodily injury as a lesser included offense of aggravated mayhem, (3) the trial court failed to instruct the jury on attempted robbery, (4) the trial court erroneously denied his *Marsden* motion, and (5) his counsel violated his Sixth Amendment rights by conceding he was guilty of robbery and carjacking. We reject defendant's contentions.

---

[2] All further statutory references are to the Penal Code.

6

A. *Robbery Conviction*

Defendant argues substantial evidence does not support his robbery conviction because there was insufficient evidence that he took J.B.'s money. We disagree.

"When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] . . . We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

"'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt. If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.'" (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) We

7

may reverse a conviction for a lack of substantial evidence only if it appears "'"'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].'"'" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

The elements of robbery are: "(1) defendant took property that was not his own; (2) the property was in the possession of another person; (3) the property was taken from the other person or his or her immediate presence; (4) the property was taken against that person's will; and (5) the defendant used force or fear to take the property or to prevent the person from resisting." (*People v. Merritt* (2017) 2 Cal.5th 819, 824.)

Defendant focuses on the third element, arguing that there was "no evidence" that he took J.B.'s money. We disagree. J.B. testified that he had $3,500 in his wallet before he went to bed on the night defendant attacked him and had told defendant that he kept $1,500 on him in case he saw a truck he wanted to buy. While attacking J.B., defendant demanded money and said he knew that J.B. had money on him. J.B. also testified that he routinely kept his wallet in his nightstand's top drawer or a kitchen, and investigating officers found his empty wallet on the ground near the nightstand with the top drawer partially open. J.B.'s neighbor testified that J.B. stated his roommate had "taken off" with his money. From this evidence, the jury could reasonably find that defendant took J.B.'s money. As a result, substantial evidence supports defendant's robbery conviction.

B. *Battery Causing Serious Bodily Injury Instruction*

Defendant argues the trial court had to sua sponte instruct the jury on the offense of battery causing serious bodily injury as a lesser included offense of aggravated mayhem. We disagree.

"[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser. [Citations.]" (*People v. Birks* (1998) 19 Cal.4th 108, 117.) The trial court must instruct on a lesser included offense, even if absent a request, if there is substantial evidence that the defendant committed only the lesser offense. (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

Battery is the willful and unlawful use of force or violence upon the person of another. (§ 242.) Battery causing serious bodily injury is a battery that causes "a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." (§ 243, subd. (f)(4).)

A person is guilty of mayhem if they "unlawfully and maliciously deprives a human being of a member of [their] body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip." (§ 203.) Aggravated mayhem occurs when someone commits mayhem, but does so with "extreme

9

indifference to the physical or psychological well-being of another person." (§ 205.) Thus, the only "difference between simple mayhem and aggravated mayhem . . . is the requisite criminal intent." (*People v. Newby* (2008) 167 Cal.App.4th 1341, 1347.)

Our Supreme Court holds that simple mayhem does not require "serious bodily injury," given that certain injuries that may support a mayhem conviction, such as cutting a person's nose or lip, "do not constitute serious bodily injuries." (*People v. Santana* (2013) 56 Cal.4th 999, 1010-1011.) And because the only difference simple and aggravated mayhem is the defendant's intent, a defendant can commit aggravated mayhem without causing serious bodily injury to the victim. It follows that battery causing serious bodily injury is not a lesser included offense of aggravated mayhem because a defendant can commit aggravated mayhem without committing battery causing serious bodily injury. (See *People v. Birks*, *supra*, 19 Cal.4th at p. 117.) The trial court thus did not have a sua sponte obligation to instruct the jury on battery causing serious bodily injury as a lesser included offense of aggravated mayhem.

C. *Attempted Robbery Instruction*

Defendant contends the trial court had to sua sponte instruct the jury on attempted robbery as a lesser included offense of robbery. We disagree.

The trial court must instruct the jury on a lesser included offense "'""when the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]"'" [Citation.] '[T]he existence of "*any* evidence, no matter how

10

weak" will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is "substantial enough to merit consideration" by the jury. [Citations.]' [Citation.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 623.)

Here, there was no substantial evidence that defendant committed only attempted robbery, not robbery. J.B. testified that he had $3,500 in his wallet, which was found empty after defendant attacked him and demanded the money. J.B.'s neighbor testified that he said defendant had taken his money and fled. Defendant presented no evidence disputing J.B.'s account or suggesting that he unsuccessfully tried to take J.B.'s money. The evidence thus established that if defendant committed any offense, it was robbery, not attempted robbery.

In any event, the trial court's failure to instruct on attempted robbery was harmless. Failure to instruct on a lesser included offense is prejudicial only if it "'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred." (*People v. Breverman* (1998) 19 Cal.4th 142, 178.) This assessment "focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of error." (*Id*. at p. 177.)

The evidence that defendant committed robbery, not attempted robbery, was strong. J.B. testified that defendant knew he had money on him and demanded the money during the attack. J.B.'s wallet was found empty on the ground next to the nightstand where he kept it, and the nightstand's door was ajar. This was circumstantial

11

evidence that defendant searched for the wallet, found it, and took the money. J.B.'s testimony was bolstered by his neighbor's testimony that he said defendant had "taken off" with his car and his money. Defendant submitted no evidence contesting J.B.'s version of events.

Finally, the jury convicted defendant of robbery, which meant that the jury found that defendant actually took J.B.'s money. If the jury found that defendant only tried to rob J.B., then the jury presumably would not have found him guilty of robbery. This further suggests that any error in the trial court's failure to instruct on attempt robbery was harmless. (See *People v. Campbell* (2015) 233 Cal.App.4th 148, 167.)

D. Marsden *Motion*

Before trial, defendant made a *Marsden* motion for new counsel. At a hearing on the motion, defendant told the trial court he had "zero confidence in his [attorney's] ability to win this trial" because "[i]t has been two years I have been incarcerated, and we have not gotten any closer to trial than the last time you all forced him to go to trial, which was – I don't know – about a month ago." Defendant continued, "So I just don't think he's ready for trial, and I would – I would feel a lot better with my life on the line with somebody better – somebody different who actually took this case seriously, in my point of view."

12

Defense counsel responded: "I understand [defendant's] concerns. I have been with this case for two years. I have been doing everything I could on this case. I feel he doesn't have a level of comfort with me and trust with me such that representation of him would be difficult. I do feel that there are issues with this case that I've tried to bring up that – you know, to temper expectations; however, this would be my first attempted murder trial. This would be – and it's not an easy one. It does have a lot of other charges, and [defendant] is looking at significant exposure. [¶] I have been placed in a position now whether I'm juggling both the criminal practice and the juvenile practice and – so I don't know that he feels I'm as prepared as I can be. I feel I'm as prepared as I can be on this trial, but he doesn't feel comfortable with me and – so I would submit to the Court that I don't know that representation is possible or fair to him."

The trial court then asked defense counsel, "When you say representation is not possible, are you ready on the case[]? You've been the attorney for many years. You've handled many cases, many trials. Are you ready on this trial?" Counsel confirmed that he was ready for the trial. Defendant replied, "I'm still not comfortable. I just would really like somebody else."

The trial court denied defendant's *Marsden* motion. The court reasoned that defense counsel was prepared for trial and had been adequately representing defendant, and there was no sign that there was an "irreconcilable breakdown in communication" between him and defendant. The court then directed defendant "to do your best to please

13

try to work with [defense counsel]" because the court was "sure [defense counsel] is going to do his best to try to work with you."

A defendant is entitled to a new attorney if the record "'clearly shows'" that (1) the first appointed attorney is not providing adequate representation or (2) defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result. (*People v. Taylor*, *supra*, 48 Cal.4th at p. 599.) The defendant bears the burden of showing that the "failure to replace counsel would substantially impair the defendant's right to assistance of counsel." (*Ibid*.) We review the trial court's denial of a *Marsden* motion for an abuse of discretion. (*Ibid*.)

Defendant does not argue that his attorney was providing him inadequate representation, but claims that he and his counsel were in "embroiled in such an irreconcilable conflict" that counsel could not effectively represent him at trial. Although defendant told the trial court that his counsel was not "ready for trial" and that he had "zero confidence" in him, he did not explain why. He did not point to anything counsel did or did not do that led him to believe counsel was unprepared.

Defendant emphasizes counsel's "candid" statements at the *Marsden* hearing, and argues they show that there was an irreconcilable between him and counsel. Although counsel submitted that he was unsure whether his "representation is possible or fair to [defendant]," he confirmed that he was ready for trial, as prepared as he could be, and had "been doing everything [he] could do on this case." And although counsel acknowledged that representing defendant "would be difficult" because of defendant's

14

lack of confidence and low "level of comfort" with counsel, neither counsel nor defendant suggested they could not communicate with one another.  Instead, defendant only lacked confidence in counsel's ability.

In other words, defendant failed to meet his burden of showing there was an irreconcilable conflict between him and his counsel that would likely result in effective representation.  "The mere '"lack of trust in . . ."' counsel is not sufficient grounds for substitution," nor are "generalized expressions of distrust and dissatisfaction."  (*People v. Taylor*, *supra*, 48 Cal.4th at p. 600.)  "If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law."  (*People v. Jones* (2003) 29 Cal.4th 1229, 1246.)  The trial court here reasonably found that there was no irreconcilable conflict between defendant and counsel, despite defendant's lack of confidence in counsel's abilities.  We therefore conclude the trial court did not abuse its discretion by denying defendant's request for a new attorney.

E.  *Sixth Amendment*

Near the beginning of his closing argument, defense counsel stated, "[Defendant] did some things on May 25th, 2018, but you cannot find him guilty of attempted murder, torture, or aggravated mayhem."  Counsel then focused the rest of his argument on those charges without addressing the robbery and carjacking charges.  After doing so, counsel

15

concluded his argument with, "[Defendant] took [J.B.'s] car keys and his money. I'm not going to tell you that he didn't. I ask you to find [defendant] not guilty of attempted murder, torture, and aggravated mayhem. Thank you." The prosecutor prefaced her rebuttal argument by stating she would focus on "the three charges that defense counsel is contesting. That's the attempted murder, the torture, and the aggravated mayhem" charges.

Defendant argues his counsel violated his Sixth Amendment right to effective representation by conceding he was guilty of the robbery and carjacking charges. In his view, his counsel could not concede his guilt on those charges without his express approval because the concession amounted to a guilty plea.

Our Supreme Court rejected the same argument in *People v. Cain* (1995) 10 Cal.4th 1, 30.) In that case, defense counsel told the jury that the defendant was guilty of two of the many charges he faced. (*Ibid.*) The defendant argued that counsel could not make these concessions without obtaining a plea waiver from defendant. (*Ibid.*) Our Supreme Court disagreed, holding that "counsel's decision not to contest, and even expressly to concede, guilt on one or more charges at the guilt phase of a capital trial is not tantamount to a guilty plea." (*Ibid.*) Our Supreme Court "has reiterated this holding in numerous cases." (*People v. Lopez* (2019) 31 Cal.App.5th 55, 63.)

Defendant argues *McCoy v. Louisiana* (2018) 138 S.Ct. 1500 and *People v. Farwell* (2018) 5 Cal.5th 295, 300 nonetheless require reversal. *McCoy* is distinguishable because the defendant there "vociferously insisted on his innocence and

16

adamantly objected to any admission of guilt," yet the trial court allowed his counsel to concede the defendant committed three murders. (*McCoy v. Louisiana*, *supra*, at p. 1503.) Defendant, however, never objected to defense counsel's concessions, so *McCoy* does not apply here. (See *People v. Lopez*, *supra*, 31 Cal.App.5th at p. 63 [finding *McCoy* distinguishable because the defendant did not object to attorney's concession of guilt].)

Farwell is also distinguishable. The parties there stipulated that the defendant had committed all the elements of one charge and the trial court instructed the jury that it had to accept the stipulated facts as true. (*People v. Farwell*, *supra*, 5 Cal.5th at p. 299.) The trial court, however, did not advise the defendant of his "constitutional rights implicated by . . . the stipulation" and did not "solicit a personal waiver of those rights" from the defendant. (*Ibid*.) Our Supreme Court held that the trial court erred because the stipulation was "tantamount to a guilty plea" and made "the guilty verdict a foregone conclusion." (*Id*. at pp. 299, 308.)

As our colleagues recognized in *Lopez*, we are bound by *Cain* and our Supreme Court's other decisions holding that defense counsel may constitutionally concede a defendant's guilt on some, but not all charges, so long as the defendant does not object. (*People v. Lopez*, *supra*, 31 Cal.App.5th at p. 63.) Because defendant never objected to his counsel doing so during closing argument, we conclude defendant's Sixth Amendment rights were not violated.

17

IV.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:

McKINSTER
Acting P. J.

MILLER
J.